UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **In re: Ranbaxy Generic Drug Application Antitrust Litigation,** | ) ) ) ) | **MDL No. 19-md-02878-NMG** |
| **This Document Relates To:** | ) ) ) | |
| *All Actions* | ) ) ) | |

**MEMORANDUM & ORDER**

This case involves five actions which were centralized in this Court and then divided into two putative class actions against Ranbaxy Inc. and Sun Pharmaceutical Industries Limited (collectively, "Ranbaxy" or "defendants").

Direct purchaser plaintiffs ("DPPs"), such as wholesalers, purchase generic drugs directly from the drug manufacturer. End-payor plaintiffs ("EPPs") are third-party payors ("TPPs") such as health plans and insurance companies that indirectly purchase (and/or provide reimbursement for generic drugs at the end of the distribution chain) from retailers and other financial intermediaries such as pharmaceutical benefit managers ("PBMs"). The DPPs and EPPs ("plaintiffs") bring claims against Ranbaxy for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), federal and state antitrust law and state consumer protection law.

Pending before the Court are the motions of the DPPs and EPPs for class certification under Federal Rules of Civil Procedure 23(a) and (b)(3).  For the reasons that follow, those motions will be allowed.

I.    **Background**

    A.    **Factual Background**

Both the Court and the parties are well acquainted with the facts, which are described in detail in the Report and Recommendation of United States Magistrate Judge M. Page Kelley on Ranbaxy's motion to dismiss the complaint of plaintiffs in the original action in this Court prior to centralization. See Meijer, Inc. v. Ranbaxy, Inc., No.1:15-cv-11828-NMG (D. Mass. Sept. 7, 2016). For purpose of completeness, however, the Court provides the following abbreviated summary of the background relevant to the pending motions.

In the early 2000s, Ranbaxy filed a number of applications with the United States Food and Drug Administration ("FDA") seeking approval to manufacture and market generic versions of various pharmaceuticals.  Under the Hatch-Waxman Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), the first generic drug manufacturer to submit a substantially complete Abbreviated New Drug Application ("ANDA") is entitled to a 180-day period of exclusivity during which no other manufacturer is permitted to

market a generic version of the subject drug.  The FDA may revoke the exclusivity period if the generic manufacturer fails to obtain tentative approval from the FDA, which requires the manufacturer to demonstrate that its facilities comply with current good manufacturing practices.

In 2004 and 2005, Ranbaxy submitted the first substantially complete ANDAs for three brand drugs at issue here: Diovan, Nexium and Valcyte.[1]  It subsequently obtained tentative approval from the FDA for its ANDAs for each of those drugs in 2007 and 2008.  Despite its early success, Ranbaxy failed to secure final approval for its generic version of Diovan until June, 2014 and did not bring that generic to market until July, 2014.  Before defendant could secure final approval for its generic Nexium and Valcyte ANDAs, the FDA revoked its tentative approval for both drugs in 2014 and Ranbaxy's generic versions were never brought to market.

Plaintiffs allege that Ranbaxy violated RICO, federal and state antitrust laws and state consumer protection laws by submitting multiple ANDAs with missing, incorrect or fraudulent information, thereby wrongfully acquiring exclusivity periods

---

[1] Diovan is an antihypertensive drug used to treat high blood pressure and heart failure, among other things.  Valcyte is an antiviral medication.  Nexium is a proton-pump inhibitor used to treat gastroesophageal reflux disease.

and delaying the market entry of generic Diovan, Nexium and
Valcyte.  Plaintiffs assert that but for defendants' allegedly
anti-competitive conduct, generic versions of those three drugs
would have entered the market and been available at lower prices
much sooner.  As a result, plaintiffs contend they paid
artificially inflated prices for generic versions of Diovan,
Nexium and Valcyte during the Class Periods.

**B.    The Proposed Classes**

The DPPs seek certification of the following three classes:

(1) All persons or entities in the United States and its
territories who purchased Diovan and/or AB-rated generic
versions of Diovan directly from any of the Defendants or
any brand or generic manufacturer at any time during the
period September 21, 2012, through and until the
anticompetitive effects of the Defendants' conduct cease
(the "Diovan Class Period");

(2) All persons or entities in the United States and its
territories who purchased Valcyte and/or AB-rated generic
versions of Valcyte directly from any of the Defendants or
any brand or generic manufacturer, but excluding those
purchasers who only purchased branded Valcyte, at any time
during the period August 1, 2014, through and until the
anticompetitive effects of the Defendants' conduct cease
(the "Valcyte Class Period"); and

(3) All persons or entities in the United States and its
territories who purchased Nexium and/or AB-rated generic
versions of Nexium directly from any of the Defendants or
any brand or generic manufacturer at any time during the
period May 27, 2014, through and until the anticompetitive
effects of the Defendants' conduct cease (the "Nexium Class
Period").

Excluded from each of the direct purchaser classes are the defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

The EPPs seek to certify the following three nationwide RICO classes:

(1) All persons or entities in the United States and its territories that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Diovan and/or AB-rated generic versions of Diovan from any of the Defendants or any brand or generic manufacturer at any time during the class period September 28, 2012, through and until the anticompetitive effects of the Defendants' conduct cease (the "Diovan Class Period");

(2) All persons or entities in the United States and its territories that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of AB-rated generic versions of Nexium from any of the Defendants or any brand or generic manufacturer, other than for resale, at any time during the class period May 27, 2014, through and until the anticompetitive effects of the Defendants' conduct cease (the "Nexium Class Period"); and

(3) All persons or entities in the United States and its territories that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Valcyte and/or AB-rated generic versions of Valcyte from any of the Defendants or any brand or generic manufacturer, other than for resale, at any time during the class period August 1, 2014, through and until the anticompetitive effects of the Defendants' conduct cease (the "Valcyte Class Period").

The EPPs also seek certification of the following three state law classes:

(1) All persons or entities in the Indirect Purchaser States that indirectly purchased, paid, and/or provided

reimbursement for some or all of the purchase price of Diovan and/or AB-rated generic versions of Diovan from any of the Defendants or any brand or generic manufacturer, other than for resale, at any time during the class period September 28, 2012, through and until the anticompetitive effects of the Defendants' conduct cease (the "Diovan Class Period");

(2) All persons or entities in the Indirect Purchaser States that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of AB-rated generic versions of Nexium from any of the Defendants or any brand or generic manufacturer, other than for resale, at any time during the class period May 27, 2014, through and until the anticompetitive effects of the Defendants' conduct cease (the "Nexium Class Period"); and

(3) All persons or entities in the Indirect Purchaser States that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Valcyte and/or AB-rated generic versions of Valcyte from any of the Defendants or any brand or generic manufacturer, other than for resale, at any time during the class period August 1, 2014, through and until the anticompetitive effects of the Defendants' conduct cease (the "Valcyte Class Period").

Excluded from all six of the EPPs' proposed classes are:

(a) natural person consumers; (b) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (c) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (d) all persons or entities who purchased Diovan, Nexium, Valcyte, or their AB-rated generic versions for purposes of resale from any of the Defendants or any brand or generic manufacturer; (e) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

### C.    Relevant Procedural History

The five actions comprising this multidistrict litigation were centralized in this Court in February, 2019.  In April, 2019, the Court consolidated for pretrial purposes all direct purchaser actions and all end-payor actions that were centralized in this District and assigned to this Court, thereby creating two putative class actions.  Amended complaints were filed by the DPPs and EPPs later that month.  The EPPs further amended their complaint in February, 2020 and March, 2021.  The DPPs also amended their complaint in March, 2021.

In November, 2020, the DPPs and EPPs each moved for class certification.  Defendants have filed oppositions to class certification to which each group of plaintiffs filed replies. This Court heard oral argument on the motions in April, 2021.

## II.  <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 23, a court may certify a class only if it finds that the proposed class satisfies all the requirements of Rule 23(a) and that classwide adjudication is appropriate for one of the reasons set forth in Rule 23(b). <u>See</u> <u>Smilo</u> v. <u>Sw. Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003).

Rule 23(a) requires that a class meet the following four criteria:

    1) the class is so numerous that joinder of all members is impracticable (numerosity),

    2) there are questions of law or fact common to the class (commonality),

    3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality) and

    4) the representative parties will fairly and adequately protect the interests of the class (adequacy).

Fed. R. Civ. P. 23(a)(1)-(4).

A district court must conduct a "rigorous analysis" under Rule 23 before certifying the class. Smilo, 323 F.3d at 38. The Court may look behind the pleadings, predict how specific issues will become relevant to facts in dispute and conduct a merits inquiry only to the extent that the merits overlap with the Rule 23 criteria. In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008). Courts should also be mindful that the prerequisites of commonality, typicality and adequacy "tend to merge" in their analysis. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 n.5 (2011).

Plaintiffs seek to certify all classes under Rule 23(b)(3) which requires that common questions of law or fact "predominate" over those affecting individual class members and that a class action be the "superior" method for fair and efficient adjudication. Fed. R. Civ. P. 23(b)(3). Implicit in Rule 23 is the additional requirement that plaintiffs

demonstrate by a preponderance of the evidence that the class is "currently and readily ascertainable based on objective criteria." <u>In re Nexium Antitrust Litig.</u>, 777 F.3d 9, 19 (1st Cir. 2015) ("<u>Nexium III</u>") (internal citation omitted).

## III. <u>DPPs' Motion for Class Certification</u>

### A.   Rule 23(a) Requirements

Of the four Rule 23(a) requirements, defendants explicitly challenge only the DPPs' showing of adequacy of representation under Rule 23(a)(4).  Given that the analysis of commonality, typicality and adequacy of representation tend to merge, this Court assumes that defendants' reliance on typicality relates to the elements of commonality and adequacy as well.  Although defendants do not expressly contest the numerosity requirement of Rule 23(a)(1), they refer to the size of the proposed classes in the context of the superiority requirement of Rule 23(b)(3). Accordingly, the Court will briefly address each of the Rule 23(a) requirements.

#### 1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  The DPPs have shown that the proposed Diovan class contains 62 members, the proposed Nexium class contains at least 51 members and the proposed Valcyte class contains 39 members.  At a minimum, the proposed

Diovan and Nexium classes are sufficiently numerous. See Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) ("[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." (internal citation omitted)).

At oral argument, defendants highlighted that the DPPs' expert admits that five of the 39 Valcyte class members suffered no injury. Nonetheless, there is no requirement of a minimum number of plaintiffs and courts in similar cases have found the numerosity requirement to be satisfied where, as here, class members are geographically dispersed and judicial economy favors proceeding as a class action. See, e.g., In re K-Dur Antitrust Litig., No. 01-1652, 2008 U.S. Dist. LEXIS 118396, at *19 n.4 (D.N.J. Apr. 14, 2008) ("[E]ven if the proposed Class consisted of only 38 members, that fact, alone, would not defeat numerosity, particularly where the members appear to be dispersed geographically and the interests of judicial economy would be served by resolving the common issues raised in this case in a single action, rather than 38 individual ones.").

The Court finds that the DPPs have established numerosity.

### 2. Commonality

To satisfy commonality, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). The

commonality requirement is a "low hurdle," Swack v. Credit
Suisse First Boston, 230 F.R.D. 250, 258 (D. Mass. 2005), and
even a single common question can satisfy this element. See
Dukes, 564 U.S. at 359.

The DPPs contend that commonality is satisfied as to both
the antitrust and RICO claims.  They note that all class members
allege injury from the same misconduct, namely the purported
anti-competitive scheme to delay the entry of cheaper generic
drugs into the market.  They also assert that their RICO claims
depend on common issues such as whether the evidence will prove
a RICO conspiracy, enterprise and pattern of racketeering
activity.

This Court finds that, because the DPPs have shown that
their claims focus on defendants' conduct, commonality has been
sufficiently pled.

### 3. Typicality

The typicality requirement is satisfied when the claims or
defenses of the representative parties are typical of the claims
or defenses of the class. Fed. R. Civ. P. 23(a)(3).  Typicality
does not require that all putative class members share
"identical claims." Garcia v. E.J. Amusements of N.H., Inc., 98
F. Supp. 3d 277, 289 (D. Mass. 2015) (citation omitted).
Rather, typicality is met when the representative's claims

> arise[] from the same event or practice or course of
> conduct that gives rise to the claims of other class
> members, and . . . are based on the same legal theory.

Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009)

(citation omitted).  In antitrust cases such as the instant

action, the typicality requirement is "particularly likely" to

be satisfied where all claims arise out of the same alleged

antitrust violations. In re Zetia Ezetimihe Antitrust Litig.,

No. 2:18-md-2836, 2020 U.S. Dist. LEXIS 112331, at *57-58 (E.D.

Va. June 18, 2020) (internal citations omitted).

Defendants contend that Meijer is an atypical class

representative because it is subject to unique defenses

unavailable to other class members.  Specifically, they assert

that the DPPs purport to show monopolization by Ranbaxy only in

the market for generic drugs.  For that reason, defendants

assert that the DPPs lack standing to assert claims related to

the purchase of brand drugs.  Meijer, as a purchaser of brand

drugs as well as generics, would therefore benefit from a

broader definition of the antitrust market.  Ranbaxy submits

that such a preference creates a conflict between Meijer and

generic-only purchasers over the appropriate market definition

because a narrower definition of the antitrust market would

allow generic-only purchasers to prove monopolization more

easily.

Defendants' contention is unpersuasive.  Although it is
true that "[c]ompetitors and consumers in the market where trade
is allegedly restrained are presumptively the proper plaintiffs"
in an antitrust action, Breiding v. Eversource Energy, 344 F.
Supp. 3d 433, 452 (D. Mass. 2018) (quoting Serpa Corp. v.
McWane, Inc., 199 F.3d 6, 10-11 (1st Cir. 1999)), it does not
follow that consumers outside of that market necessarily lack
standing.  Rather, standing depends on whether the injury
suffered "flows from that which makes defendants' acts
unlawful." Serpa Corp., 199 F.3d at 10 (internal citation
omitted).  Here, the DPPs allege that all class members have
suffered overcharge injuries flowing from Ranbaxy's anti-
competitive conduct.

In any event, the Court need not conclusively resolve that
dispute because brand-only purchasers are, in fact, consumers in
the generic market allegedly restrained by Ranbaxy's anti-
competitive conduct given that the delay of generics prevented
brand-only purchasers from switching to purchasing cheaper
generics.

Furthermore, the purpose of the typicality requirement is

> to ensure that the named representative's claims have the
> same essential characteristics as the claims of the class
> at large.

In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig., 257 F.R.D. 315, 321 (D. Mass. 2009) (internal citation omitted).

Here, Meijer's claim arises from the same course of conduct and is based on the same legal theories that give rise to the claims of all other members of the proposed DPP classes. All class members, including Meijer, allege that they suffered an overcharge injury because Ranbaxy improperly delayed entry of generic drugs in violation of the Sherman Act and RICO. The Court finds that to be sufficient to satisfy the typicality requirement. See Zetia, 2020 U.S. Dist. LEXIS 112331, at *60-61 (concluding that the claims of the named plaintiff are typical of the class because he "alleges the same injury as the rest of the class" and "share[s] the same interest in producing proof in relation to the existence, scope, duration, and effect of [the] alleged conspiracy.").

### 4. Adequacy

The element of adequacy is satisfied if 1) there is no conflict between the interest of the named plaintiffs and the class members and 2) counsel chosen by the named plaintiffs are qualified and able to litigate the claims vigorously. S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc., 241 F.R.D. 85 (D. Mass. 2007) (citing Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).

Notwithstanding defendants' arguments to the contrary, the Court has already determined that there is no conflict between Meijer as the named plaintiff and the rest of the proposed class members.  As to the second criterion, defendants do not dispute that the DPPs' counsel is qualified and able to litigate the claims vigorously under Rule 23(a)(4) and the DPPs have shown that their counsel has extensive experience litigating similar antitrust class actions.

Accordingly, the adequacy element is satisfied.

### B.   Rule 23(b)(3) Predominance

In addition to the Rule 23(a) requirements, the DPPs must establish that

> questions of law or fact common to class members predominate over any questions affecting only individual members.

Fed. R. Civ. P. 23(b)(3).  To satisfy the predominance requirement, the DPPs must show that

> the fact of antitrust impact can[] be established through common proof and that any resulting damages would likewise be established by sufficiently common proof.

Nexium III, 777 F.3d at 18 (internal quotation marks omitted). They need not prove that each element of their claims is susceptible to classwide proof.  See Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 469 (2013).

Defendants assert that the DPPs cannot show that common issues predominate because individualized inquiries will be required to determine whether each class member suffered an antitrust injury.  The model used by the DPPs' expert, Dr. Meredith Rosenthal, compares the monthly average prices of the at-issue drugs with the hypothetical average prices for those same drugs in a world without the alleged anti-competitive conduct ("but-for world").  According to Ranbaxy, that model fails to account for price variability among class members in the real world, thereby obscuring uninjured class members.

The Court is satisfied that the DPPs have met their burden under Rule 23(b)(3) to demonstrate that antitrust impact is capable of proof by common evidence.  Dr. Rosenthal relies on pharmaceutical economic literature, contemporaneously-created business forecasts from brand and generic manufacturers of each relevant drug and transactions-level sales data for each at-issue drug to conclude that all or virtually all of the members of each proposed class have suffered an overcharge injury.  That kind of common evidence

> has generally been found sufficient to establish
> [antitrust] injury on a classwide basis, except when a
> large number of putative class members are uninjured.

In re Intuniv Antitrust Litig., No. 1:16-cv-12653, 2019 U.S. Dist. LEXIS 162792, at *29 (D. Mass. Sept. 24, 2019) (collecting

cases); see also In re Loestrin 24 FE Antitrust Litig., No. 13-2472, 2019 U.S. Dist. LEXIS 118308, at *47-48 (D.R.I. July 2, 2019) (concluding that plaintiffs established classwide injury through "a combination of transactional data and manufacturers' forecasts to predict prices in the but-for world").  As discussed in further detail below, this is not a case in which a large number of DPP class members are uninjured.

Defendants' attack on the use of averages by Dr. Rosenthal is misguided.  First, it is

> common practice to use averages to determine whether class
> members suffered a common antitrust injury

in direct purchaser actions. In re Zetia (Ezetimibe) Antitrust Litig., 481 F. Supp. 3d 571, 578 (E.D. Va. 2020).  Any potential variation among class members in the actual prices paid for each drug is more relevant to assessing the extent of the injury suffered than to determining the existence of an injury at all.  See In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47, 57-58 (D. Mass. 2013) ("Nexium II") ("The Defendants' focus on the variations in purchase price among the putative class members directly challenges the Direct Purchasers' damages model, but it does not weaken their assertion of common impact.").

Second, Dr. Rosenthal's methodology does not obscure a significant number of uninjured class members.  Defendants

submit that each DPP pays a unique price based upon factors such
as individualized negotiations with manufacturers, chargebacks
and other credits for which Dr. Rosenthal fails to account.
They ignore, however, that an antitrust injury

> occurs the moment the purchaser incurs an overcharge,
> whether or not that injury is later offset

and that a single overcharge is sufficient to constitute such an
injury. Nexium III, 777 F.3d at 27 ("Paying an overcharge caused
by the alleged anticompetitive conduct on a single purchase
suffices to show — as a legal and factual matter — impact or
fact of damage.").

By using monthly average prices, Dr. Rosenthal's model
necessarily incorporates the variation across class members in
the actual and but-for prices of each drug to come to a
reasonable conclusion that class members suffered a common
injury. See Loestrin 24, 2019 U.S. Dist. LEXIS 118308, at *46
(approving of a methodology which incorporates the "variation
across Class members in the actual prices they paid and in the
prices they would have paid, providing averages that correctly
summarize the combined effects of all of these Class members in
a single classwide overcharge measure."). Through this "well
accepted" methodology, id., Dr. Rosenthal demonstrates that the
average but-for prices were always or almost always below the
average prices actually paid, thus proving a common injury.

Even if the proposed DPP classes include a de minimis number of uninjured members, that fact alone is not fatal to class certification at this early stage. See Loestrin 24, 2019 U.S. Dist. LEXIS 118308, at *48 ("The prospect that a handful of identifiable class members may be uninjured is not a barrier to class certification."); Nexium III, 777 F.3d at 25 ("Numerous courts have certified plaintiff classes even though the plaintiffs have not been able to use common evidence to show harm to all class members.").  The DPPs have persuasively shown through Dr. Rosenthal's analysis that the number of potentially uninjured class members is in single digits and that they can be identified and excluded at a later stage in a manageable fashion.  Consequently, this is not a case in which certification of the classes would be inappropriate because

> any class member may be uninjured, and . . . apparently
> thousands who in fact suffered no injury.

In re Asacol Antitrust Litig., 907 F.3d 42, 53 (1st Cir. 2018).

In sum, the DPPs have sufficiently shown that classwide injury and damages can be demonstrated through evidence common to the class and that common issues predominate over individualized inquiries.

C.    **Rule 23(b)(3) Superiority**

Prior to certification, Rule 23(b)(3) requires a showing that the class action would be

> superior to other available methods for fairly and
> efficiently adjudicating the controversy.

That Rule provides a "nonexhaustive list of factors" for courts to consider when determining whether the superiority requirement has been met:

> (A) the interest of members of the class in individually
> controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the
> controversy already commenced by or against members of the
> class; (C) the desirability or undesirability of
> concentrating the litigation of the claims in the
> particular forum; (D) the difficulties likely to be
> encountered in the management of a class action.

Amchem Prods. v. Windsor, 521 U.S. 591, 615-16 (1997) (quoting Fed. R. Civ. P. 23(b)(3)).

Defendants contend that representative litigation is not superior because 1) the proposed DPP classes are small in number, 2) the alleged damages are large and concentrated in only three DPPs and 3) there are fundamental intra-class conflicts.

Two of those three arguments have already been addressed. First, the Court has determined that the purported conflict between generic-only and brand-only purchasers poses no

substantial threat to class cohesion.  Second, the Court has
concluded that each of the three proposed classes is
sufficiently numerous that joinder would be impracticable and
judicial economy favors proceeding as a class action.
Consequently, neither the alleged intra-class conflict nor the
purported small size of the classes poses an obstacle to
certification.

As to defendant's contention regarding the concentration of
damages among a small number of the DPPs, that fact does not
defeat certification.  Where several class members are "large,
well-capitalized companies with multi-million dollar claims,"
class resolution is still superior if

> the majority of the proposed class members have negative
> value claims (i.e., the expenses, including expert fees,
> exceed their possible recovery).

Am. Sales Co., LLC v. Pfizer, Inc., No. 2:14cv361, 2017 U.S.
Dist. LEXIS 137222, at *31 (E.D. Va. July 28, 2017).  Here, the
DPPs have shown, using data provided by Ranbaxy's expert, that
many members of the proposed classes would likely have negative
value claims if forced to litigate in separate actions.  Even if
some class members do have economic incentives to litigate their
claims individually, counsel for the DPPs noted at oral argument
that some members would still be dissuaded from doing so out of
fear of retaliation by their suppliers.

Finally, class resolution is particularly appropriate here given that "in the complex context of delayed generic entry the benefits of Rule 23 have been widely recognized." Id. at 53. Indeed, representative litigation of the DPPs' claims is fair and efficient because it will "avoid duplicative, expensive, and potentially inconsistent adjudication of the common claims." Id.

## IV. **EPPs' Motion for Class Certification**

As to the EPPs, Defendants do not oppose certification of their classes under the Rule 23(a) requirements. Nevertheless, the Court concludes that the requirements of numerosity, commonality, typicality and adequacy of representation are met here.

The proposed classes are sufficiently numerous such that joinder would be impracticable considering that each class is comprised of thousands of TPPs who paid for prescriptions of the subject drugs during the class hearings. Commonality is satisfied because the EPPs allege injury from the same allegedly unlawful conduct of defendants. The EPPs have shown that the claims and defenses of the class representatives are typical of those of the class because all EPP claims arise from the same anti-competitive scheme. Finally, the EPPs have satisfied the representation requirement by explaining that the interests of

the class representatives are aligned with those of the other class members.

Ranbaxy does, however, oppose certification of the EPPs' proposed classes for failure to satisfy the predominance and ascertainability requirements of Rule 23(b)(3).  The Court will address those issues seriatim.

### A.    Rule 23(b)(3) Predominance

To establish that common issues predominate, the EPPs must show that

> the fact of antitrust impact can[] be established through common proof and that any resulting damages would likewise be established by sufficiently common proof.

Nexium III, 777 F.3d at 18 (internal quotation marks omitted).

Ranbaxy contends that the EPPs fail to satisfy the predominance requirement for two reasons.  First, defendants submit that the use of aggregate pricing to establish classwide antitrust injury fails to account for substantial price variability and thus conceals the existence of uninjured class members.  Second, Ranbaxy maintains that significant variation in the state law governing the EPPs' claims causes individual questions of law to predominate over common ones.

### 1. Common Injury Provable by Common Evidence

Ranbaxy challenges the methodology used by the EPPs'
expert, Dr. Rena Conti, for relying on "average prices, average
copayments, and average rebates to measure injury."  According
to defendants, because individual payments made by TPPs for the
subject drugs vary widely due to factors such as cost-sharing
and rebates, Dr. Conti's methodology obscures class members who
did not overpay and were therefore uninjured.

That argument is virtually identical to the one asserted
against the proposed DPP classes and will be rejected for
similar reasons.  First, Dr. Conti's "yardstick" methodology and
her use of averages are widely accepted methods of proving
antitrust injury and damages on a classwide basis. See, e.g., In
re Loestrin 24 Fe Antitrust Litig., 410 F. Supp. 3d 352, 389-90
(D.R.I. 2019) (observing that the "yardstick" method is
generally accepted and has been endorsed by the First Circuit
Court of Appeals); In re Nexium Antitrust Litig., 297 F.R.D.
168, 183 (D. Mass. 2013) ("Nexium I") ("Dr. Rosenthal's
aggregate damages analysis demonstrates both common antitrust
impact and damages to the class. Further, the End-Payors at this
stage of litigation need not prove individualized proof of
injury.").

Furthermore, antitrust injury

- 24 -

occurs the moment the purchaser incurs an overcharge,
whether or not that injury is later offset.

Nexium III, 777 F.3d at 27.  For that reason, offsets such as
consumer contributions and manufacturer rebates are more
relevant to the extent of damages than to the incurrence of
injury.  Dr. Conti's analysis also indicates that defendants
greatly exaggerate the variation in pricing of the at-issue
drugs.  For example, graphs in her rebuttal report demonstrate
that approximately 99% of the prices paid for those drugs fall
within a very narrow range.

Defendants also overstate the extent to which three
discrete groups of EPP class members are likely to be uninjured.

First, defendants assert that the EPPs ignore the existence
of "brand loyal" TPPs which would not have purchased generics
under any circumstances and would have suffered no injury from a
delayed generic entry.  Ranbaxy faults Dr. Conti for assuming
that plans that only purchased brand drugs prior to generic
entry and made no purchase after generic entry would have
switched to generic in the event of future purchases.  Yet such
an assumption is reasonable given that the evidence proffered by
Dr. Conti shows that brand loyalty is doubtful among TPPs and
that meaningful generic competition would likely cause all TPPs
to purchase generics.  See Loestrin 24, 410 F. Supp. 3d at 404
n.46 ("That a TPP did not purchase generic Loestrin 24 once it

became available is of no moment when we have evidence that, with sustained and robust generic competition, each TPP likely would have made at least one such purchase.")

Defendants also contend that TPPs which manage Medicare D plans are unlikely to be injured because other parties such as the federal government and consumers cover a high percentage of the costs for the at-issue drugs.  Similarly, Ranbaxy submits that there are still more uninjured TPPs because they paid a higher price for generics than the brand drugs for which they received higher copayments and rebates.  Both arguments can be easily rebutted because, as noted several times before, antitrust injury occurs at the moment of the overcharge regardless of later rebates or other offsets.  That some TPPs may have ultimately paid more for generics is relevant to the amount of damages incurred but not for determining antitrust impact.

An overcharge injury occurs as long as the price for one of the subject drugs is higher for a purchaser in the actual world than it would have been in the but-for world.  The EPPs have demonstrated by virtue of Dr. Conti's careful and thorough analysis that all or virtually all class members suffered an overcharge injury which is provable by common evidence.

### 2. Variation in State Law

To certify the proposed classes under Rule 23(b)(3), "variations in state law [must not] swamp any common issues and defeat predominance." <u>Nexium I</u>, 297 F.R.D. at 175 (internal citation omitted).  The necessity of applying the laws of multiple states does not automatically defeat class certification if the variation among those laws is not particularly material or significant. <u>See</u> <u>In re Solodyn Antitrust Litig.</u>, No. 14-md-02503, 2017 U.S. Dist. LEXIS 170676, at *67-68 (D. Mass. Oct. 16, 2017) (collecting cases).

Defendants submit that the EPPs cannot demonstrate that the common issues predominate in light of the "significant variation[]" in the 21 state antitrust laws and the 11 consumer protection laws under which the EPPs bring suit.  The EPPs respond that any variation is neither material nor significant and that their state law claims should be allowed to proceed.

The variety of state laws applicable to the EPPs' claims does not overwhelm predominance.  The EPPs have provided charts compiling the state laws applicable to their antitrust and consumer protection claims and have identified the substantial similarities among those laws and between the state and federal antitrust provisions.  Ranbaxy purports to highlight material distinctions between the applicable state laws but the EPPs have

shown that much of its argument is based upon misinterpretations
of state law.  Ranbaxy does not contest that the core elements
of the EPPs' claims are virtually identical under all applicable
state laws.  Any minor differences in the relevant state laws
can be accommodated through the use of special jury instructions
and verdict forms, as suggested by the EPPs. See In re Lidoderm
Antitrust Litig., No. 14-md-02521, 2017 U.S. Dist. LEXIS 24097,
at *111 (N.D. Ca. Feb. 21, 2017) ("[D]ifferences [in state law]
can be readily accommodated on a special verdict form or through
other mechanisms routinely employed in complex litigations like
this one.").

Notably, it is common for courts in the First Circuit and
elsewhere to certify end-payor classes in similar antitrust
actions even when it is necessary to apply the laws of multiple
states. See, e.g., Solodyn, 2017 U.S. Dist. LEXIS 170676, at *68
(collecting cases); Lidoderm, 2017 U.S. Dist. LEXIS 24097, at
*111 (same).  A different result is unwarranted here where the
variation in the applicable state laws, to the extent it exists,
does not appear to be material or significant.

**B.  Ascertainability**

To satisfy the ascertainability requirement, the EPPs

    must show, by a preponderance of the evidence, that the
    class is currently and readily ascertainable based on
    objective criteria.

Nexium III, 777 F.3d at 19 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013)).  At the certification stage, it is unnecessary to identify every class member but the class must be

> sufficiently ascertainable to permit a court to decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment.

Schonton v. MPA Granada Highlands LLC, No. 16-cv-12151, 2019 U.S. Dist. LEXIS 56502, at *8 (D. Mass. Apr. 2, 2019) (internal quotation marks omitted).

The EPPs submit that their proposed procedure will easily ascertain class members through the use of detailed pharmaceutical transaction data from the largest PBMs to identify purchases of the three at-issue drugs and their generic equivalents in the applicable states during the relevant class periods.  They declare that uninjured EPPs can also be excised from the classes using the same objective criteria.  Ranbaxy rejoins that the EPPs' plan is not administratively feasible for either task.

### 1. Identifying Eligible Class Members with PBM Data

Defendants first contend that using drug transactions data from the seven largest PBMs would exclude an impermissibly large number of eligible class members.

They underscore data provided by Ms. Craft which demonstrate that the seven largest PBMs processed between 89%

and 96% of all retail prescriptions from 2015 to 2018.
According to Ranbaxy, that data indicates that as much as 11% of
all retail prescriptions will be excluded from the classes.
Defendants fail to point out, however, that the 11% figure
applies only to the year 2015.  The percentage of retail
prescriptions processed outside of the seven largest PBMs drops
to 8% in 2016 and 4% in both 2017 and 2018.

Ranbaxy further asserts that because some insurers operate
their own independent PBMs, the data from the seven largest PBMs
would not account for the transactions of such insurers.  Yet
they fail to identify any such insurers and the analysis
provided by plaintiffs' expert demonstrates that the data from
the largest PBMs will likely capture all but a negligible number
of eligible class members.  In any event, additional PBMs could
be subpoenaed to achieve greater data coverage if necessary.  As
discussed in further detail below, the Court is satisfied that
such a procedure would be relatively straightforward and
inexpensive.

In addition to its challenges to the contents of the PBM
data, Ranbaxy contends that the collection of such data is not
feasible because there is no evidence regarding whether 1) such
data contains sufficient information to identify class members,

2) the data can be easily understood and organized and 3) the PBMs retain such data long enough.

To the contrary, plaintiffs' expert has established that the requisite data exists and has proffered a detailed approach for using it to identify class members.  Courts in similar cases have confirmed that the identification of class members is administratively feasible because

> in the pharmaceutical industry, data is collected and maintained at every level of the transaction.

Solodyn, 2017 U.S. Dist. LEXIS 170676, at *51.  With respect to the availability of older but still relevant data, Ms. Craft has explained and other courts have recognized that

> economic incentives for PBMs, pharmacies, and other relevant actors are aligned with retaining [prescription drug transaction] data in some form for as long as possible.

Loestrin 24, 410 F. Supp. 3d at 400.

For those reasons, the Court is satisfied that the use of retail prescription transactions information from (at least) the seven largest PBMs is an administratively feasible process by which virtually all eligible class members can be identified.

### 2. Applying Class Exclusions with PBM Data

Defendants also contend that class identity data cannot be used effectively to apply class exclusions.  They maintain that

the EPPs have not demonstrated how certain excluded parties, namely governmental entities and fully-insured plans, can be separated from eligible class members such as self-funded health plans.

Ranbaxy overstates the difficulty of determining class exclusions based upon the proposed PBM data sets.  It relies heavily on the theory that there is no single way to search datasets for non-class members such as Third-Party Administrators ("TPAs") and Administrative Services Only entities ("ASOs") which facilitate payments on behalf of their self-funded plan clients.  Although plaintiffs' expert concedes that the labels "TPA" and "ASO" may not be present in the data, she proffers a detailed explanation of how multiple data fields including the "client/carrier" and "account" fields can be used jointly to identify efficiently such non-class members.  To the extent that Ranbaxy complains that Ms. Craft has not tested her proposed methodology, that argument has already been raised and rejected elsewhere. See In re Namenda Indirect Purchaser Antitrust Litig., No. 1:15-cv-6549, 2021 WL 509988, at *12 (S.D.N.Y. Feb. 11, 2021) (holding there is no requirement that a class be identified or even that the methodology for doing so be in place by the time of certification).

As to governmental entities, the EPPs have proffered an administratively feasible method of identifying and excluding those plans "through PBMs, government websites and personnel offices, actuarial consulting databases, and data publishers." Other courts have been satisfied by similar methods of identifying governmental plans in order to exclude them from end-payor classes. See, e.g., Namenda, 2021 WL 509988, at *12-13 ("Craft notes that PBMs processing the insurance claims would know the identity of any government entities . . . that they service. . . . Information about state/federal insurance plans is also publicly available, and so whoever is analyzing the raw PBM data could use this information to apply the exclusion."); In re Zetia Ezetimibe Antitrust Litig., No. 2:18-md-2836, 2020 U.S. Dist. LEXIS 183601, at *38 (E.D. Va. Aug. 13, 2020) ("Craft persuasively testified that PBMs 'absolutely know' which of its clients are federal or state entities and thus would be able to point them out to EPPs.").

Because Ms. Craft has proposed using PBM data in which government plans have been highlighted and using additional third-party data as a backstop, the Court sees no reason to deviate from prior approvals of such approaches to exclude governmental entities.

### 3. **Economic Feasibility of EPPs' Methodology**

Finally, Ranbaxy submits that the EPPs have not shown that the proposed methodology for ascertaining class members can be implemented without excessive cost.

Defendants' cost-based objection is without merit. Plaintiffs' expert clearly explains in her rebuttal report that PBMs regularly provide data in response to subpoenas at no cost to the parties and that some PBMs have a "standard litigation package" of claims data to be produced in cases such as this one.  Defendants provide no contradictory evidence. Accordingly, there is no indication that the EPPs' proposed methodology would be "prohibitively expensive and thus infeasible." In re Niaspan Antitrust Litig., 464 F. Supp. 3d 678, 707 (E.D. Pa. 2020).

**ORDER**

For the foregoing reasons, the motions of the Direct Purchaser Plaintiffs and the End-Payor Plaintiffs for class certification (Docket Nos. 286 and 287) are **ALLOWED.**


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated May 14, 2021