## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: RANBAXY GENERIC DRUG APPLICATION ANTITRUST LITIGATION | MDL No. 2878 |
| THIS DOCUMENT RELATES TO:<br><br>All End-Payor Actions | Master File No.<br>19-md-02878-NMG |

## MEMORANDUM OF LAW IN SUPPORT OF END-PAYOR LEAD CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES, AND APPLICATION FOR SERVICE AWARDS

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... iii

I.        INTRODUCTION ............................................................................................. 1

II.       BACKGROUND ............................................................................................... 2

    A.   Case Investigation and Pleadings.................................................................. 2

    B.   Class Counsel Engages in Significant Fact and Expert Discovery.............................. 3

    C.   The EPP Classes Are Certified .................................................................... 3

    D.   Summary Judgment and *Daubert* Motions are Filed ....................................... 5

    E.   Trial Preparations.................................................................................... 5

    F.   Settlement Negotiations ............................................................................ 6

III.     ARGUMENT ................................................................................................... 7

    A.   THE REQUESTED ATTORNEYS' FEE AWARD IS FAIR AND REASONABLE 7

        1.   The Percentage-of-the-Fund Method Supports the Lead Class Counsel's Fee Request................................................................................................ 8

            a)   This Case Presented Substantial Risks from Inception through Trial ............. 9

            b)   The Fee Award Is Reasonable in Light of Fee Awards in Other Generic Suppression Lawsuits ................................................................... 11

            c)   Class Counsel Are Highly Skilled and Possess Extensive Expertise Litigating Pharmaceutical Class Actions.......................................................... 12

            d)   This Case Was Extremely Complex ............................................................ 13

            e)   Class Counsel Litigated with Diligence and Efficiency ................................. 14

            f)   The Classes Substantially Benefit from the Settlement................................. 15

            g)   Class Counsel's Requested Fee Furthers the Public Interest in Incentivizing End-Payor Suits Challenging Anticompetitive Practices by Pharmaceutical Companies .................................................................................. 15

        2.   The Lodestar Cross-Check Further Supports the Reasonableness of Class Counsel's Fee................................................................................................ 17

    B.   THE REQUESTED EXPENSES ARE REASONABLE ......................................... 18

C.    THE REQUESTED SERVICE AWARDS ARE REASONABLE. ........................... 19

IV.    CONCLUSION ........................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*,
   481 F.2d 1045 (2d Cir. 1973) ................................................. 16

*Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*,
   512 F. Supp. 3d 196 (D. Mass. 2020) .................................. 12

*Bezdek v. Vibram USA Inc.*,
   79 F. Supp. 3d 324 (D. Mass. 2015) ................................ 7, 19

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ............................................................ 7

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) .......................................................... 10

*Bussie v. Allmerica Fin. Corp.*,
   No. 97-40204-NMG, 1999 WL 342042 (D. Mass. May 19, 1999) ............... 8, 18, 20

*Carlson v. Target Enter., Inc.*,
   No. 18-40139, 2020 WL 1332839 (D. Mass. Mar. 23, 2020) .................... 19

*Giorgio v. Duxbury*,
   No. 12-11171-LTS, 2016 WL 3983232 (D. Mass. July 25, 2016) .......... 17

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000) ................................................ 16

*Gordan v. Mass. Mut. Life Ins. Co.*,
   No. 13-cv-30184, 2016 WL 11272044 (D. Mass. Nov. 3, 2016) .......... 18

*Grendel's Den, Inc. v. Larkin*,
   749 F.2d 945 (1st Cir. 1984) .......................................... 8, 9

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................ 9

*In re "Agent Orange" Prod. Liab. Litig.*,
   818 F.2d 216 (2d Cir. 1987) ................................................ 6

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ............................................ 4, 10

*In re Cabletron Sys., Inc. Sec. Litig.*,

239 F.R.D. 30 (D.N.H. 2006) ...................................................................... 8

*In re Fidelity/Micron Sec. Litig.*,
167 F.3d 735 (1st Cir. 1999) ...................................................................... 19

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) ....................................................... 13

*In re Intuniv Antitrust Litig.*,
2019 WL 3947262 (D. Mass. Aug. 21, 2019) ........................................... 10

*In re Lupron Mktg. & Sales Practices Litig.*,
No. MDL 1430, 2005 WL 2006833 (D. Mass. Aug. 17 2005) ..................... 9, 16, 20

*In re Neurontin Mktg. & Sales Practices Litig.*,
58 F. Supp. 3d 167 (D. Mass. 2014) ........................................................ 8, 11, 18

*In re Nexium Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016) ...................................................................... 10

*In re Niaspan Antitrust Litig.*,
No. 13-MD-2460, 2020 WL 2933824 (E.D. Pa. June 2, 2020) .................. 10

*In re Puerto Rican Cabotage Antitrust Litig.*,
815 F. Supp. 2d 448 (D.P.R. 2011) .......................................................... 8, 13, 14, 16

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005) ................................................................ 8, 14, 18, 20

*In re Superior Beverage/Glass Container Consol. Pretrial*,
133 F.R.D. 119 (N.D. Ill. 1990) ............................................................... 13

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
56 F.3d 295 (1st Cir. 1995) ...................................................................... 7, 8

*In re TJX Companies Retail Sec. Breach Litig.*,
584 F. Supp. 2d (noting typical factors) .................................................. 8, 9, 15

*In re Urethane Antitrust Litig.*,
No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ................. 12

*In re Volkswagen & Audi Warranty Extension Litig.*,
89 F. Supp. 3d 155 (D. Mass. 2015) ........................................................ 7, 8

*In re Wholesale Grocery Prods. Antitrust Litig.*,
957 F.3d 879 (8th Cir. 2020) .................................................................... 10

*In re WorldCom, Inc. Sec. Litig.*,

388 F. Supp. 2d 319 (S.D.N.Y. 2005) ......................................................................... 7

*Latorraca v. Centennial Techs. Inc.*,
834 F. Supp. 2d 25 (D. Mass. 2011) ......................................................................... 19

*Lauture v. A.C. Moore Arts & Crafts, Inc.*,
No. 17-CV-10219, 2017 WL 5900058 (D. Mass. Nov. 28, 2017)............................ 20

*Lucas v. Kmart Corp.*,
No. 99-cv-01923-JLK-CBS, 2006 WL 2729260 (D. Colo July 27, 2006) .............. 17

*Mazola v. May Dep't Stores Co.*,
No. 97-cv-10872-NG, 1999 WL 1261312 (D. Mass. Jan. 27, 1999)........................ 16

*Medoff v. CVS Caremark Corp.*,
No. 09-cv-554-JNL, 2016 WL 632238 (D.R.I. Feb. 17, 2016)................................. 9

*Mooney v. Domino's Pizza, Inc.*,
No. 1:14-cv-13723, 2018 WL 10232918 (D. Mass. Jan. 23, 2018)......................... 18

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
No. 05-11848, 2009 WL 2408560 (D. Mass. Aug. 3, 2009)..................................... 18

*Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*,
No. 3:10-CV-30163, 2014 WL 6968424 (D. Mass. Dec. 9, 2014) ........................... 20

*Spicer v. Chi. Bd. Options Exchange, Inc.*,
844 F. Supp. 1226 (N.D. Ill. 1993) ........................................................................ 20

*Spruill v. Alexander*,
No. 09-292S, 2011 WL 2413837 (D.R.I. Mar. 31, 2011) ........................................ 17

*Tyco Intern., Ltd. Multidistrict Litig.*,
535 F. Supp. 2d ....................................................................................................... 17

*Williams v. Poulous*,
Nos. 94-2057, 94-2058, 1995 WL 281451 (1st Cir. May 12, 1995)......................... 17

**Rules**

FED. R. CIV. P. 23(f) .......................................................................................................... 5

FED. R. CIV. P. 23(h) ......................................................................................................... 7

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, Lead Class Counsel[1] for the End-Payor Class Plaintiffs ("EPPs") respectfully submit this memorandum of law in support of their motion (hereinafter, the "Fee and Expense Application") seeking an award of 28% of the $145,000,000 common fund ($40,600,000.00 plus interest) as attorneys' fees and $2,268,845.61 (1.6% of the common fund) as payment for Class Counsel's[2] litigation expenses. End-Payor Class Plaintiffs[3] also seek Service Awards totaling $50,000 for the two Class Representatives, United Food and Commercial Works Health and Welfare Fund of Northeastern Pennsylvania ("UFCW NEPA") and Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. ("BCBS LA") (collectively, the "Plaintiffs" or "Class Representatives") as compensation for the service that Plaintiffs provided to the Classes and the risks they undertook as Class Representatives.

## I.    <u>INTRODUCTION</u>

EPPs are third-party payors, entities such as health insurers and union-sponsored health and welfare funds, that pay for prescription drugs their members and insureds purchase. This Action[4] was brought on behalf of all EPPs in the United States who paid more than they otherwise would have for brand or generic Diovan, Nexium, and Valcyte, as a result of the alleged misconduct of Defendants Sun Pharmaceutical Industries Ltd. and Ranbaxy, Inc. ("Ranbaxy" or "Defendants"). Class Counsel marshalled its resources and effectively prosecuted the case nearly to trial, leading to a Settlement that provides real, tangible benefits to the Classes of thousands of

---

[1] "Lead Class Counsel" are: (1) Lowey Dannenberg, P.C. and (2) The Dugan Law Firm, APLC.

[2] "Class Counsel" are: (1) Lowey Dannenberg, P.C., (2) The Dugan Law Firm, APLC, (3) Young Law Group, P.C. and (4) Aylstock, Witkin, Kreis & Overholtz, PLLC. Young Law Group and Aylstock, Witkin, Kreis & Overholtz, PLLC are hereinafter referred to as "Additional Counsel."

[3] Unless otherwise defined herein, capitalized terms have the same meaning as in the Settlement Agreement dated April 8, 2022 ("Settlement Agreement"). ECF No. 587-1. Unless otherwise indicated, internal citations and quotation marks are omitted and ECF citations are to the docket for this MDL.

[4] *In re Ranbaxy Generic Drug Application Antitrust Litig*., 19-md-02878-NMG (D. Mass.).

EPPs. The Net Settlement Fund will be distributed to eligible Class Members upon filing of valid proofs of claim.

Class Counsel's recovery is significant in light of the risks involved in litigating this Action. Defendants fiercely contested EPPs at every turn. The most immediate risk of a potential adverse ruling involved the impending jury trial, which was two weeks away when Lead Class Counsel and Defendants reached this Settlement and would have almost certainly resulted in an appeal regardless of the verdict. Despite these risks, Class Counsel—who proceeded on a contingent fee basis, advanced millions of dollars in costs for experts and other expenses to ready the case for trial, and, collectively, brought their decades of experience to bear to litigate this case—secured substantial benefits on behalf of the Classes.

## II.    **BACKGROUND**[5]

### A.    **Case Investigation and Pleadings**[6]

On November 6, 2018, Lowey Dannenberg filed the first action, on behalf of Plaintiff UFCW NEPA and EPPs in the Eastern District of Pennsylvania. The complaint asserted novel legal theories related to antitrust monopolization and racketeering, requiring Lowey Dannenberg to devote significant time prior to filing the complaint to ensure that there was a sound legal basis for the claims brought under every one of the twenty-one state antitrust laws, fifteen state consumer protection laws, and federal racketeering law. On February 11, 2019, the UFCW Action was transferred to this Court for coordinated proceedings with three actions of the Direct Purchaser Plaintiffs ("DPPs"). Following similar internal investigation and analyses from the perspective of

---

[5] The Court is aware of the background and procedural history of this case and so it will only be briefly summarized here. A more complete description is available in the Joint Declaration of Gerald Lawrence, Esq. and James R. Dugan II, Esq. in support of (A) End-Payor Plaintiffs' Unopposed Motion for Final Approval of Action Settlement and (B) End-Payor Lead Class Counsel's Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards (the "Joint Decl.") at ¶¶12-86.
[6] *See* Joint Decl., at ¶¶12-23.

a large health insurer, on February 13, 2019, The Dugan Law Firm filed an action on behalf of Plaintiff BCBS LA in this Court. Lead Class Counsel filed the Consolidated End-Payor Complaint with Jury Demand on April 19, 2019. After two rounds of fiercely contested motion to dismiss briefing, Lead Class Counsel sought leave to file the Second Amended Consolidated End-Payor Class Action Complaint and Jury Demand. Defendants opposed leave to amend, which the Court granted on March 1, 2021. On March 16, 2021, Defendants filed their Answer.

### B.    Class Counsel Engages in Significant Fact and Expert Discovery[7]

Beginning in April 2019, the parties engaged in substantial fact and expert discovery.  Lead Class Counsel worked in conjunction with counsel for the DPPs (collectively with the EPPs, the "purchasers") to gather and synthesize facts, including documents, data and witness testimony from, among others: Defendants, alleged co-conspirators in the RICO enterprise, the FDA, and third-party drug manufacturers. In all, Lead Class Counsel, with assistance of Additional Counsel, reviewed millions of pages of documents produced by Defendants and third parties. Despite the challenges imposed by the COVID-19 pandemic, Lead Class Counsel overcame those challenges and twenty (20) fact witnesses and (20) expert witnesses were deposed.

### C.    The EPP Classes Are Certified[8]

Lead Class Counsel engaged in substantial work with their experts in order to prepare their class certification filing. First, Lead Class Counsel worked with their damages expert, Dr. Rena Conti, to show that there was injury to substantially all of the class members using common proof. Lead Class Counsel and Dr. Conti analyzed documents and data from the Class Representatives, Defendants, and third parties to demonstrate historic trends in the generic pharmaceutical marketplace and in third-party payor purchasing habits. Lead Class Counsel also worked with Dr.

---

[7] *See* Joint Decl. at ¶¶24-45.
[8] *See* Joint Decl. at ¶¶46-58.

Conti to utilize nationwide market claims data for the three drugs at issue to show impact and the scope of damages for nationwide and state-specific classes.

Lead Class Counsel recognized that recent class certification decisions in the First Circuit presented significant hurdles to proving class certification. To that end, Lead Class Counsel hired an additional expert, Ms. Laura Craft, to opine on matters related to ascertainability of the Class Members. This required Lead Class Counsel to invest hundreds of additional hours to analyze documents and data collected in discovery with their expert to show the richness of pharmaceutical data and the ease at which such data could be used to identify class members.

On November 2, 2020, Lead Class Counsel filed their motion for class certification. Lead Class Counsel also filed opening reports for both Dr. Conti and Ms. Craft on November 2, 2020. On February 10, 2021, Defendants filed their opposition. Defendants challenged EPPs' ability to show class-wide injury on several fronts, claiming that their expert's methodology of using average pricing masked significant variation in pricing, and that various subgroups, such as Medicare Part D plans and so-called "brand loyalists," within the EPPs' classes were not injured. Defendants also lodged multiple arguments rooted in EPPs' state law claims. Finally, relying on the First Circuit's recent decision in *In re Asacol Antitrust Litig.*,[9] Defendants claimed that EPPs' classes were not ascertainable because they had no administratively feasible methodology for applying class exclusions and eliminating uninjured class members.

Lead Class Counsel worked with both Ms. Craft and Dr. Conti to thoroughly rebut the assertions in Defendants' opposition and in the report from defense expert Dr. Bruce Strombom in their rebuttal reports. After oral argument from Lead Class Counsel, assisted with a slide presentation, the Court certified the EPP Classes.

---

[9] 907 F.3d 42, 53–54 (1st Cir. 2018).

On May 28, 2021, Defendants filed a petition pursuant to Fed. R. Civ. P. 23(f) seeking permission to appeal the class certification Order. While the Court's May 14, 2021 Order granted both the DPP and EPP class certification motions, Defendants only sought to appeal the certification of the End-Payor Classes under Rule 23(f), claiming the Court's decision conflicted with First Circuit precedent because the EPPs could not prove classwide injury through common proof, rebates were relevant to antitrust injury, and the EPPs could be "brand-loyal." Lead Class Counsel vigorously opposed Defendants' arguments and pointed to the substantial law developed within the First Circuit and others that agreed with this Court's decision, and the evidence adduced through discovery and in expert analysis that supported the EPPs' position. The First Circuit denied the petition on December 21, 2021.

While Defendants' Rule 23(f) petition was pending, this Court approved EPPs' plan for providing class notice of the certified class action and appointed A.B. Data, Ltd. as Notice Administrator on October 26, 2021. On or about November 5, 2021, notice was disseminated. Only three opt-out requests were filed before the deadline of December 20, 2021.

> **D.      Summary Judgment and *Daubert* Motions are Filed[10]**

The parties filed their respective motions for summary judgment on May 17, 2021. On the same day the parties also filed their *Daubert* motions to exclude the opposing parties' experts. After full briefing and oral argument held on October 22, 2021, the Court denied all summary judgment motions on November 22, 2021. At the Status Conference held on December 21, 2021, the Court denied all *Daubert* motions.

> **E.      Trial Preparations[11]**

Lead Class Counsel was actively engaged in every facet of trial preparations. This included

---

[10] *See* Joint Decl. at  ¶¶59-65.
[11] *See* Joint Decl. at ¶¶66-80.

designating certain witness depositions, crafting portions of the exhibit list, drafting jury instructions, voir dire questions, and verdict slip questions. Lead Class Counsel was preparing to be primary examiner for six live witnesses at trial, and to deliver opening and closing arguments to the jury.

### F.    Settlement Negotiations[12]

Beginning in October 2021, Lead Class Counsel and Defendants began engaging in settlement discussions. On November 15-16, 2021, Lead Class Counsel engaged in a two-day in-person mediation with Kenneth Feinberg. After the parties failed to reach resolution at the mediation, periodic informal conversations between Lead Class Counsel and Mr. Feinberg continued.

Beginning on February 11, 2022, Lead Class Counsel and Defendants resumed active settlement negotiations through Mr. Feinberg until Defendants made an offer on March 21, 2022 that was within the range Lead Class Counsel had analyzed to be acceptable. After several additional days of negotiations, and with additional assistance from Mr. Feinberg to finalize certain terms, Lead Class Counsel executed their Settlement Agreement with Defendants on April 8, 2022. The Settlement was preliminarily approved on April 28, 2022.

Throughout the litigation, Lead Class Counsel conducted a thorough, efficient prosecution, and in the process avoided duplication of work among themselves or in their collaboration with DPPs' counsel. In light of their efforts throughout the litigation from inception through to the settlement, the Fee and Expense Application is reasonable. The attorneys' fee request is justified under the percentage-of-the-fund approach and reflects a reasonable multiplier on Class Counsel's lodestar. If awarded, Lead Class Counsel will allocate the fees among Class Counsel in proportion

---

[12] *See* Joint Decl. at ¶¶81-86.

to their contributions to this case.[13] The expenses for which Class Counsel seeks payment were reasonably incurred to achieve this excellent result for the Classes and should be paid. Finally, the Class Representatives devoted significant time and effort to this litigation, at substantial personal risk, and Service Awards of $25,000 to each Class Representative are also appropriate.

## III.   ARGUMENT[14]

### A.   THE REQUESTED ATTORNEYS' FEE AWARD IS FAIR AND REASONABLE

In class action litigation, attorneys whose work results in a common benefit for class members are entitled to fair and reasonable fees for their work, subject to the court's discretion.[15] The First Circuit generally favors the "percentage-of-the-fund" method, in which the parties' settlement establishes a "common fund" of money for the benefit of class members and the court may "shape[] the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those benefitted by the litigation."[16] The percentage-of-the-fund method has distinct structural advantages for common fund cases due to its ease in administration and efficiency, as well as providing "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so."[17] From a policy standpoint, "the [percentage] method of calculating fees more

---

[13] *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (recognizing class counsel may distribute general fee award in "some relationship to the services rendered").

[14] Class Counsel's efforts on behalf of the Classes are described in the Joint Decl. and in the supporting Class Counsel declarations attached thereto as Exhibits 1 through 4.

[15] *See, e.g.*, FED. R. CIV. P. 23(h) ("[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."); *see also In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995) (attorneys in common fund cases entitled to reasonable attorney fees from fund); *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 349 (D. Mass. 2015) ("Attorneys in a certified class action may be awarded reasonable fees and costs."); *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 164 (D. Mass. 2015) (reasonable fee is question in sound discretion of trial judge).

[16] *In re Thirteen Appeals*, 56 F.3d at 305; *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).

[17] *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005); *see also In re Thirteen Appeals*, 56 F.3d at 308.

appropriately aligns the interests of the class with the interests of class counsel—the larger the value of the settlement, the larger the value of the fee award."[18] Courts have discretion to cross-check the reasonableness of this award  with the "lodestar" method, in which the court calculates the fee award by "determining the number of hours productively spent on the litigation and multiplying those hours by reasonable hourly rates."[19] The resulting lodestar may be increased by a multiplier based on factors including the risks related to pursuing contingent fees in the case, delay in payment, quality of representation, novelty of the law and public interest.[20] As discussed below, the requested fee award of $40,600,000 is objectively fair and reasonable under both the percentage-of-the-fund method and lodestar method.

> **1.    The Percentage-of-the-Fund Method Supports the Lead Class Counsel's Fee Request**

Although the First Circuit has not endorsed a specified set of factors to be used in evaluating a fee request's reasonableness, district courts in this Circuit generally consider the following factors: (1) the risk of the litigation and nonpayment; (2) the fee awards in similar cases; (3) the complexity and duration of the litigation; (4) the skill, experience, and efficiency of the attorneys involved; (5) the amount of time devoted to the case by counsel; (6) public policy considerations; and (7) the benefit to the class.[21] When many of these factors are present, courts will often award a larger percentage of the fund (under the percentage-of-the-fund method) and/or

---

[18] *Bussie v. Allmerica Fin. Corp.*, No. 97-40204-NMG, 1999 WL 342042, at *2 (D. Mass. May 19, 1999).

[19] *In re Thirteen Appeals*, 56 F.3d at 305, 307 (noting percentage-of fund method "better approximates the workings of the marketplace" because it "is result-oriented rather than process-oriented, while lodestar method "encourages lawyers to expend excessive hours" on the case).

[20] *See Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 951 (1st Cir. 1984); *In re Volkswagen*, 89 F. Supp. 3d at 165 ("A case that does not involve any novel issues of law or implicate the public interest, for example, may be a poor candidate for an attorneys' fees multiplier.").

[21] *See In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38 (D.N.H. 2006) (multi-factor test common approach to determine reasonableness of fee award); *accord In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 170 (D. Mass. 2014) (same);  *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d at 401 (noting typical factors); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 457-58 (D.P.R. 2011) (same); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005) (same).

a higher multiplier (under the lodestar method).[22] Here, all of these factors favor Lead Class Counsel's fee request.

<strong>a)    This Case Presented Substantial Risks from Inception through Trial</strong>

"[M]any cases recognize that the risk [of non-payment] assumed by an attorney is perhaps the foremost factor in determining an appropriate fee award."[23] "A contingency fee arrangement often justifies an increase in the award of attorneys' fees…[otherwise] very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money especially in light of the risks of recovering nothing."[24] "Where[] lead counsel undertook this action on a contingency basis and faced a significant risk of non-payment, this factor weighs more heavily in favor of rewarding litigation counsel."[25]

This case was litigated on a fully contingent basis and presented a substantial risk of non-payment.  For almost four years, Lead Class Counsel, assisted by Additional Counsel, devoted thousands of hours of attorney time and millions of dollars in expenses investigating the facts underlying the EPPs' claims, defending against Defendants' various motions, certifying a litigation class and preparing for trial, work for which there was no guarantee counsel would ever be compensated.  The complexity of generic delay suits as well as Ranbaxy's vigorous defense necessitated Lead Class Counsel's considerable investment of time and resources, to advance EPPs' claims and achieve the substantial settlement reached in this case.

Lead Class Counsel also bore challenges that were unique to litigating on behalf of classes of indirect purchasers. For instance, because *Illinois Brick Co. v. Illinois*[26] bars indirect

---

[22] *See Grendel's Den*, 749 F.2d at 951.

[23] *In re Lupron Mktg. & Sales Practices Litig.*, No. MDL 1430, 2005 WL 2006833, at *4 (D. Mass. Aug. 17, 2005).

[24] *Id.*; *see also In re TJX*, 584 F. Supp. 2d at 398 (acknowledging that fee may be enhanced to account for the contingency risk).

[25] *Medoff v. CVS Caremark Corp.*, No. 09-cv-554-JNL, 2016 WL 632238, at *9 (D.R.I. Feb. 17, 2016).

[26] 431 U.S. 720 (1977).

purchaser claims under federal antitrust law, Lead Class Counsel brought EPPs' antitrust claims under numerous individual state antitrust and consumer protection laws. This strategy required Lead Class Counsel to navigate several challenges. As just one example, it was unclear at the outset of the litigation whether the ruling on preemption in *Buckman Co. v. Plaintiffs' Legal Comm.*[27] and its progeny would apply to EPPs' state law claims.[28] Additionally, recent class certification decisions in the First Circuit, including the decisions in *In re Intuniv Antitrust Litig.*[29] and *In re Asacol Antitrust Litig.*,[30] presented significant hurdles to EPPs' prosecution of the case on a class-wide basis, as demonstrated by other decisions in currently pending matters.[31] Defendants' attempt to appeal only the EPPs' class certification ruling further highlights these risks.[32] Despite these additional uncertainties, Lead Class Counsel took the considerable risks of retaining a new expert to combat class certification, at their own expense, and invested hundreds of hours of additional attorney time, for which they might never have been compensated.

Trying this case would have presented considerable additional risks, as reflected in the mixed results of other recent antitrust trials.[33] Though contested by EPPs, in their proposed verdict slip Defendants asserted questions about the statute of limitations, *Noerr-Pennington* Immunity, and mail and wire fraud, concluding with byzantine damages questions that had disjunctive phrasing even counsel could not follow.[34] If even a single lay juror declined to find for EPPs on

---

[27] 531 U.S. 341, 347 (2001).
[28] *See* Joint Decl., at ¶19.
[29] No. 1:16-CV-12396-ADB, 2019 WL 3947262, at *1 (D. Mass. Aug. 21, 2019) (denying IPP class certification).
[30] 907 F.3d 42 (1st Cir. 2018) (denying EPP class certification).
[31] *See In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2020 WL 2933824 (E.D. Pa. June 2, 2020) (denying EPP class certification over predominance concerns).
[32] *See* Joint Decl., at ¶55.
[33] *See, e.g., In re Nexium Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016) (affirming verdict and entry of judgment for defendants following a six-week jury trial in another generic suppression suit); *In re Wholesale Grocery Prods. Antitrust Litig.*, 957 F.3d 879 (8th Cir. 2020) (affirming verdict and entry of judgment for defendants).
[34] At the point the Settlement was reached, the Court had not yet issued a final verdict slip.

any one of these issues, EPPs would have recovered nothing. In addition, even if EPPs were to succeed in establishing liability, the End-Payor Classes would have been required to prove damages. Defendants' expert asserted in his report, and likely would have at trial, that EPPs were entitled as little as no damages for all three drugs.[35]

Nor would a favorable verdict have resolved the litigation. Defendants appealed, or attempted to appeal, nearly every major ruling that went against them. When the DPP and EPP Classes were certified in the Court's May 14, 2021 class certification Order, Defendants only attempted to appeal EPPs' class certification. Defendants almost certainly would have appealed any verdict in favor of EPPs, and vice versa, further jeopardizing and delaying any class recovery.

### b) The Fee Award Is Reasonable in Light of Fee Awards in Other Generic Suppression Lawsuits

Lead Class Counsel's twenty-eight percent attorneys' fee request is firmly supported by fee awards in similar cases.[36] In this Circuit, percentage fee awards range from 20% to 35% of the fund.[37] End-payor generic suppression cases share certain characteristics, such as subject matter complexity, voluminous discovery and experts, class certification difficulties, and sophisticated and aggressive defense counsel, so the most appropriate comparators are attorneys' fees awarded in such suits. Among comparable end-payor generic suppression class actions, fees of 28% or greater are by far the most common.[38] Lead Class Counsel are aware of attorneys' fee awards in eighteen end-payor generic suppression class actions over the past decade-and-a-half. In fifteen of these cases, fees of 33% or greater were awarded, including in all of the twelve most recent, four from this Circuit; in two cases, fees between 30% and 33% were awarded; and in three cases, fees

---

[35] *See* Strombom Report, ECF No. 331-13 at ¶8.
[36] *See* Exhibit 6 to the Joint Decl., Chart of Attorneys' Awards in End-Payor Generic Suppression Class Action Cases.
[37] *In re Neurontin Mktg. & Sales Pracs. Litig.,* 58 F. Supp. 3d 167 (D. Mass. 2014).
[38] *See* Ex. 6 to Joint Decl.

between 25% and 30% were awarded.[39] Moreover, reflecting the quality of the results Lead Class Counsel obtained, the $145 million recovery is among the largest settlements in recent end-payor cases.[40]

Here, Class Counsel's unreimbursed efforts over the course of nearly four years culminated in one of the largest settlements for end payors in recent history and required considerable expenditure of skill, risk, time, and resources. Whether those efforts would result in any recovery was unknown up until two weeks before trial in this matter was set to begin. Under the circumstances, Class Counsel's fee request is not only in-line with fee awards in similar cases, but also extremely reasonable.

### c) Class Counsel Are Highly Skilled and Possess Extensive Expertise Litigating Pharmaceutical Class Actions

Lead Class Counsel are among the most experienced class action and antitrust firms in the country. In this case, Lead Class Counsel brought to bear their decades of antitrust and complex litigation experience, including their extensive experience representing third party payors in similar suits against pharmaceutical manufacturers and serving as lead and executive committee counsel in many of the nation's largest and most significant pharmaceutical antitrust cases.[41]

---

[39] *See* Ex. 6 to Joint Decl.; *see also In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-WES-PAS (D.R.I. Feb 6, 2020), ECF No. 1401-4 (awarding 33% attorney fees)*; In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503-DJC (D. Mass. July 18, 2018), ECF No.1176.

[40] *See* Ex. 6 to Joint Decl. This Court has recognized that "no special standards or presumptions categorically to reduce fee awards" apply in so-called "mega-fund" cases, where the settlement is generally $100 million or more, and federal district courts across the country have routinely awarded class counsel fees in excess of 30% in these cases. *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 512 F. Supp. 3d 196, 239 (D. Mass. 2020); *see also In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement and a 3.2 multiplier, noting "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher"); *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388 (D. Mass. Feb 2, 2015), ECF No. 1095 (awarding 33% fee of $590 million settlement).

[41] *See e.g. In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-md-2724 (E.D. Pa.) (Lowey Dannenberg representing three direct-action plaintiffs and Dugan Law Firm on plaintiffs' steering committee); *Blue Cross Blue Shield Ass'n, et al. v. GlaxoSmithKline LLC*, No. 13-4663-JS (E.D. Pa.) (Lowey Dannenberg representing forty health insurance plans alleging RICO violations as a result of misrepresentations about safety of drugs manufactured at unsafe plant); *In re: National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio) (Dugan Law Firm member of plaintiffs' executive committee).

Despite facing considerable obstacles, Class Counsel were able to employ their skill and experience here to obtain an excellent recovery for the End-Payor Classes. This suit was particularly complex, as it involved multiple liability theories (i.e., antitrust, consumer protection and RICO) and required a deep understanding of patent, antitrust, and pharmaceutical regulatory law, as well as the facts particular to this case. Ranbaxy, a multi-national pharmaceutical company, retained counsel who employed an aggressive litigation strategy. Accordingly, the quality of representation provided by Class Counsel supports the fee request.

### d)     This Case Was Extremely Complex

"The complexity of [] antitrust law is well known."[42] "[A]ntitrust class actions are notoriously complex, protracted, and bitterly fought."[43] In antitrust cases, "[t]he 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated."[44] This case was no exception. Lead Class Counsel, on behalf of the EPPs, asserted an attempted monopolization theory.  As to two of the three drugs, Lead Class Counsel would have had to persuade the jury that Defendants exerted monopoly power for drugs they had not yet sold.  On top of antitrust law and damages economic damages theories that are present in antitrust cases, the case required mastery in patent and drug law, and competency in the science and manufacturing processes behind pharmaceutical products. For example, Lead Class Counsel was preparing an expert to testify at trial on bioequivalence testing of Nexium for administration through nasogastric tubes. The RICO claim further required an understanding of racketeering law. Defendants' aggressive litigation strategy added to this complexity.

---

[42] *Puerto Rican Cabotage*, 815 F. Supp. 2d at 459.

[43] *Id*.

[44] *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990); *see also In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate").

### e)  Class Counsel Litigated with Diligence and Efficiency

The extensive time and effort Class Counsel expended in prosecuting this action favors Counsel's requested fee award.[45] In total, Class Counsel devoted 18,733 hours to pursuing, and ultimately obtaining, a recovery on behalf of the End-Payor Classes. The amount of time Class Counsel invested was necessary and appropriate in light of the length of the litigation, the complexity of the claims and defenses, and the prowess of the Defendants' attorneys. The extensive efforts taken to achieve and maintain certification of the Classes, described in detail in section II.C above, is just one piece of the substantial work Class Counsel expended in all aspects of the case. Class Counsel actively litigated this case for almost four years. During that period, as described above and in the accompanying declaration, Lead Class Counsel, as assisted by Additional Counsel, briefed and largely defeated, two rounds of motions to dismiss; engaged in extensive discovery; successfully obtained certification of the End-Payor Classes and defeated an attempted appeal to the First Circuit; briefed summary judgment motions; filed and defended against *Daubert* challenges and motions *in limine*; prepared the case for trial, and successfully negotiated a substantial settlement for the End-Payor Classes.[46]

In performing these tasks for the benefit of the End-Payor Classes, Lead Class Counsel made every effort to be efficient, in terms of both time spent and ensuring counsel and staff handled these tasks with appropriate skill and experience. Lead Class Counsel reviewed the time to ensure that all work performed was for the common benefit, nonduplicative, or excessive. To that end, each firm was notified that billing spent in connection with the leadership negotiations, certain administrative tasks, and this attorneys' fee and expense request would be disallowed. In order to

---

[45] *Puerto Rican Cabotage*, 815 F. Supp. 2d at 461 (where counsel "spent significant, but not excessive, time prosecuting the instant action…this factor points in favor of Lead Counsel's fee request").
[46] *In re Relafen*, 231 F.R.D. at 80.

avoid duplication of effort, Lead Class Counsel worked together with counsel for the DPPs to divide tasks and focus on the pertinent legal questions and factual record. When appropriate, counsel for the EPPs and DPPs groups jointly retained experts, ensuring that the purchasers spoke with a single voice on common issues and reducing each group's costs.

### f)    The Classes Substantially Benefit from the Settlement

The benefits "actually accruing to the class is an important consideration in assessing the reasonableness of the fee award."[47] This is to ensure that the class action mechanism "delivers relief into the hands of those in whose name it was established-the class."[48]

The Settlement here represents an excellent recovery for End-Payor Class Members. Lead Class Counsel obtained a substantial recovery of $145,000,000 for the benefit of the thousands of EPPs constituting the Classes. The Settlement is all cash, is not based on the claims received, and does not permit any reversion of funds to Defendants. As a result, to the extent any Class Members do not submit claims, that portion of the Net Settlement Fund will be redistributed to those Class Members that do submit claims.  The EPPs' $145 million Settlement is among the largest in recent generic suppression end-payor cases, and more than three times as large as the typical end-payor settlement.[49] Class Members will greatly benefit.

### g)    Class Counsel's Requested Fee Furthers the Public Interest in Incentivizing End-Payor Suits Challenging Anticompetitive Practices by Pharmaceutical Companies

Class Counsel's attorneys' fees request is consistent with public policy objectives. Courts have recognized that attorneys' fee awards should reflect the important goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public

---

[47] *In re TJX*, 584 F. Supp. 2d at 402.
[48] *Id*. at 406.
[49] *See* Joint Decl. at Ex. 6.

interest."[50] Antitrust class actions advance the public interest both by deterring predatory behavior and compensating those who have been wronged.[51] "In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation."[52]

The rising cost of pharmaceuticals is among the most pressing issues facing our country.[53] The public interest in attracting experienced and sophisticated litigators is particularly salient in suits challenging anticompetitive practices in the health care industry, as drug companies think of new ways to game the system, at the expense of EPPs. Once they're found out, defendant pharmaceutical companies have vast resources and retain top-tier defense firms that typically pursue aggressive litigation strategies. Reasonable attorneys' fees are necessary to ensure that such suits attract equally adept class counsel who are incentivized to invest the time and resources necessary to obtain recoveries for the class. The End-Payor Classes contain not only health insurers, but also small employer and union-sponsored health and welfare funds, like Class Representative UFCW NEPA. Absent the class action vehicle, these small plans most likely would have no recourse against rampant industry abuse.[54] The benefits of these actions are felt not only by class members, but ripple out to the public and future plaintiffs, as favorable rulings push the law forward for future cases.[55]

---

[50] *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 51 (2d Cir. 2000).

[51] *Lupron*, 2005 WL 2006833, at *6 ("The public interest is also served by the defendants' disgorgement of the proceeds of predatory marketplace behavior.").

[52] *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973).

[53] Ashley Kirzinger et al., *KFF Health Tracking Poll – May 2021: Prescription Drugs*, KAISER FAMILY FOUNDATION (June 3, 2021), https://www.kff.org/health-costs/poll-finding/kff-health-tracking-poll-may-2021/prescription.

[54] *See Puerto Rican Cabotage,* 815 F. Supp. 2d at 463 ("Class action plaintiffs' attorneys provide an invaluable service by aggregating the seemingly insignificant harms endured by a large multitude into a distinct sum where the collective injury can then become apparent."); *Mazola v. May Dep't Stores Co.*, No. 97-cv-10872-NG, 1999 WL 1261312, at *4 (D. Mass. Jan. 27, 1999) (class actions "give[] voice to relatively small claimants who may not be aware of statutory violations or have an avenue to relief. . . . the only way in which to make such actions economically feasible is to award [attorneys' fees.]").

[55] Lead Class Counsel's efforts here benefitted class members in other pending litigation. *See, e.g.,* Notice of

## 2.    The Lodestar Cross-Check Further Supports the Reasonableness of Class Counsel's Fee

Class Counsel's lodestar confirms the reasonableness of their fee request. When lodestar is used as a cross-check, "the focus is not on the 'necessity and reasonableness of every hour' of the lodestar, but on the broader question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys."[56] Class Counsel expended over 18,733 hours resulting in a total lodestar of more than $13,804,000.[57] These hours were reasonable and necessary to litigate this case effectively and to achieve the best possible recovery on behalf of the Classes. The Settlement was only reached after Class Counsel conducted an extensive factual investigation and legal analysis. As described above and in the Joint Declaration, Lead Class Counsel devoted significant time and efforts to litigating this action.  Given the (relatively) short but intense duration of the case over the past four years, the hours Class Counsel accrued for all of this work are reasonable.

Additionally, the billing rates Class Counsel charged for this work are reasonable. Reasonable hourly rates are those rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."[58] When a case is national in scope, the relevant community may be a location other than the forum, or even the national legal community, and the relevant rates are the out-of-town or "nationally prevailing rates" for similar attorneys' services.[59] Here, the litigation required the expertise of counsel experienced in class

---

Supplemental Authority in Support of Motion for Class Certification by End-Payor Plaintiffs, *In re: Opana ER Antitrust Litig.*, 1:14-cv-10150 (N.D. Ill. May 18, 2021), ECF No. 722.

[56] *Tyco Intern., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d at 270.

[57] Joint Decl., at ¶¶91-93.

[58] *Giorgio v. Duxbury*, No. 12-11171-LTS, 2016 WL 3983232, at *2 (D. Mass. July 25, 2016).

[59] *See, e.g., Williams v. Poulous*, Nos. 94-2057, 94-2058, 1995 WL 281451, at *4 (1st Cir. May 12, 1995) ("out-of-town rates may be applied if the complexities of a particular case require that particular expertise of non-local counsel . . . or 'when the case is an undesirable one which capable attorneys within the forum community are not willing to prosecute or defend[.]'"); *Spruill v. Alexander*, No. 09-292S, 2011 WL 2413837, at *4-5 (D.R.I. Mar. 31, 2011); (applying out-of-town rates because of attorneys' expertise); *Lucas v. Kmart Corp.*, No. 99-cv-01923-JLK-

actions and the highly specialized area of generic drug suppression cases on behalf of EPPs. Class Counsel brought claims on behalf of nationwide classes, as well as state subclasses under the laws of several states. Class Counsel are based out-of-state, *i.e.*, New York, Pennsylvania, and Louisiana. Class Counsel's rates are comparable to those charged in national, complex class actions, and have been previously accepted by this Court.[60]

Class Counsel worked to ensure that the reported lodestar is based only on the time spent for the common benefit of the End-Payor Classes. As described above, each Class Counsel firm's time reports were reviewed by Lead Class Counsel and certain time was excluded. Class Counsel have also submitted declarations from each firm providing additional detail on the work performed, as well as support for their hourly rates.[61] The twenty-eight percent fee request represents only a moderate enhancement, a 2.94 multiplier, over Class Counsel's reported lodestar. This enhancement appropriately reflects the fact that counsel performed all work on a contingent basis, forgoing payment for several years. Indeed, courts, including this one, have recognized that multipliers greater than that requested here are reasonable in comparable suits, and so should it be deemed here.[62]

## B.   THE REQUESTED EXPENSES ARE REASONABLE

Class Counsel seeks reimbursement of $2,268,845.61 in litigation expenses that were

---

CBS, 2006 WL 2729260, at *4 (D. Colo. July 27, 2006) ("[T]he relevant community for purposes of determining a reasonable billing rate for Class Counsel likely consists of attorneys who litigate nationwide, complex class actions.").

[60] *See Barr v. Drizly, LLC*, No. 1:20-CV-11492 (D. Mass. Nov. 4, 2021) (ECF. No. 72) (awarding attorney fees).

[61] *See* Exs. 1 through 4 to Joint Decl..

[62] *See, e.g., Mooney v. Domino's Pizza, Inc.,* No. 1:14-cv-13723, 2018 WL 10232918, at *1 (D. Mass. Jan. 23, 2018) (applying a lodestar multiplier of 4.77); *Gordan v. Mass. Mut. Life Ins. Co.,* No. 13-cv-30184, 2016 WL 11272044, at *3 (D. Mass. Nov. 3, 2016) (applying a lodestar multiplier of 3.66)*; In re Neurontin Mktg. and Sales Practices Litig.,* 58 F. Supp. 3d 167 (D. Mass. 2014) (applying a lodestar multiplier of 3.32;) *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05-11148, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (applying a lodestar multiplier of 8.3); *Bussie*, 1999 WL 342042 (awarding fee 3.32 times attorney lodestar)*. See also In re Relafen*, 231 F.R.D. at 81-82 (noting vast majority of fee awards in cases with $50-200 million common funds had multipliers between 1.0 and 4.0).

18

reasonably incurred in prosecuting this action. The First Circuit has recognized that "lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax."[63]

The substantial majority of expenses (75%) were paid out of common litigation funds, to which Class Counsel firms contributed. These funds were used to pay a variety of expenses that benefited the class, including the costs of testifying and consulting experts, the document review platform, remote deposition expenses, trial support, jury research and mediation services. Litigation fund expenses amounted to $1,698,955.64. In addition to those expenses, individual firms separately incurred a total of $569,889.97 in expenses. A more detailed breakdown of expenses is reflected in the attached Joint Declaration of Lead Class Counsel.[64] Lastly, the court-appointed claims administrator, A.B. Data, has advised Class Counsel that it estimates it will cost no more than $225,000 to complete the claims distribution process.[65]

### C.    THE REQUESTED SERVICE AWARDS ARE REASONABLE.

EPPs request Service Awards of $25,000 to each of the two Class Representatives in connection with the Settlement. Courts routinely approve service awards "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."[66] "In granting [service] awards to named plaintiffs in class actions, courts

---

[63] *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *see also Latorraca v. Centennial Techs. Inc.*, 834 F. Supp. 2d 25, 28 (D. Mass. 2011) ("In addition to attorneys' fees, lawyers who recover a common fund for a class are entitled to reimbursement of out-of- pocket expenses incurred during litigation.").

[64] *See* Joint Decl., at ¶¶100-101; *see also Bezdek*, 79 F. Supp. 3d at 351-52 (finding "costs associated with mediation, legal research, filing fees, consultation with experts, photocopying, and travel to hearings, depositions, and meeting…reasonable.").

[65] *See* Joint Decl., at ¶103; *see also* Exhibit 5 to Joint Decl., Declaration of Eric J. Miller Regarding (A) Mailing of the Postcard Notice; (B) Publication of Summary Notice; and (C) Report on Objections and Requests to Speak at Fairness Hearing Received To Date ("Miller Decl."), at ¶14.

[66] *Carlson v. Target Enter., Inc.*, No. 18-40139, 2020 WL 1332839, at *3 (D. Mass. Mar. 23, 2020).

consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves."[67]

The requested awards are consistent with those approved for class representatives in other end-payor generic delay suits,[68] as well as those approved in other class suits in this circuit.[69] Moreover, because they represent only 0.034% of the total value of the Settlement, the proposed Service Awards would have a negligible impact on other Class Members' recoveries. The substance of the Class Representatives' work on this litigation further supports the End-Payors' requested awards.[70] The Class Representatives actively participated in the litigation, stayed abreast of the progress of the case, collected and produced documents and responded to interrogatories, and prepared for and gave depositions. Because this case settled two weeks before trial, both Class Representatives expended considerable time and effort preparing to testify. The Class Representatives performed these services over many years despite the risk that there would be no recovery for the End-Payor Classes. Further, granting the Service Awards promotes a public policy of encouraging individuals to undertake the responsibility of representative lawsuits.[71]

---

[67] *Bussie*, 1999 WL 342042, at *3.

[68] Order at 4, *In re Solodyn*, No. 1:14-md-02503-DJC (D. Mass. July 18, 2018), ECF No. 1176 ($20,000 service award to TPP class representative and $145,000 total in service awards); Order at 10, *In re Aggrenox Antitrust Litig.*, No. 3:14-md-02516-SRU (D. Conn. July 19, 2018), ECF No. 821 (awarding $100,000 total in service awards); *In re Neurontin*, 58. F. Supp. 3d 167 (awarding $25,000 to each TPP class representative).

[69] *See Spicer v. Chi. Bd. Options Exchange, Inc*., 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000); *Lauture v. A.C. Moore Arts & Crafts, Inc*., No. 17-CV-10219, 2017 WL 5900058, at *1 (D. Mass. Nov. 28, 2017) (reflecting service awards of $15,000 to each class representative; *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig*., No. 3:10-CV-30163, 2014 WL 6968424, at *7 (D. Mass. Dec. 9, 2014) (reflecting service awards of $10,000 to each of 10 class representatives).

[70] *See In re Lupron*, 2005 WL 2006833, at *7 ("[W]here, as here, the named plaintiffs participated actively in the litigation," such awards "serve an important function in promoting class action settlements.").

[71] *See In re Relafen*, 231 F.R.D. at 82 ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit.").

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Lead Class Counsel respectfully requests: (i) attorneys' fees in the amount of $40,600,000 plus interest; (ii) expenses reimbursed in the amount of $2,268,845.61 and approval to expend up to $225,000 to complete the settlement distribution process; and (iii) Service Awards of $25,000 for each of the two Class Representatives.

Dated: June 27, 2022                                         Respectfully submitted,

**LOWEY DANNENBERG, P.C.**

By: *<u>/s/Renee A. Nolan</u>*
Gerald Lawrence
Renee A. Nolan
William Olson
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel. (215) 399-4770
glawrence@lowey.com
rnolan@lowey.com
wolson@lowey.com

Peter D. St. Phillip
44 South Broadway
Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com

*Counsel for Plaintiff United Food and
Commercial Workers Health and Welfare
Fund of Northeastern Pennsylvania and the
End-Payor Classes*

**THE DUGAN LAW FIRM, APLC**

James R. Dugan, II
David S. Scalia
TerriAnne Benedetto
One Canal Place – Suite 1000

365 Canal Street
New Orleans, LA 70130
Tel: 504-648-0180
Fax: 866-328-7670
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com
tbenedetto@dugan-lawfirm.com

*Counsel for Louisiana Health Service &
Indemnity Company d/b/a Blue Cross and
Blue Shield of Louisiana, and HMO La., Inc.
and the End-Payor Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, a true copy of the foregoing document was served on all counsel of record by electronic transmission and/or electronically filing the document with the Court's CM/ECF system.

*/s/Renee A. Nolan*