**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: RANBAXY GENERIC DRUG APPLICATION ANTITRUST LITIGATION | MDL No. 2878 |
| THIS DOCUMENT RELATES TO:<br><br>All Direct Purchaser Actions | Master File No.<br>19-md-02878-NMG |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT, APPROVAL OF PROPOSED PLAN OF ALLOCATION, AND ORDER OF DISMISSAL WITH PREJUDICE**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF THE CASE ...................................................................................2

III.    ARGUMENT ...........................................................................................................3

    A.      Legal Standard............................................................................................3

    B.      The Settlement should be approved as fair, reasonable, and adequate...................5

        1.      *Grinnell* Factor No. 1. The litigation lasted for years, involved numerous complexities, and was expensive to prosecute. ...........................5

        2.      *Grinnell* Factor No. 2. All members of the Direct Purchaser Classes received direct mail and/or email notice, and no member of any of the Direct Purchaser Classes has objected. ....................................7

        3.      *Grinnell* Factor No. 3. The proceedings were at a late stage, on the eve of trial, after a thorough years-long discovery process, and the parties fully understood the strengths and weaknesses of the case at the time of the proposed Settlement.............................................9

        4.      *Grinnell* Factor Nos. 4 and 5. The proposed Settlement obviates the risks inherent in establishing liability and damages. ...........................10

        5.      *Grinnell* Factor No. 6. The risk of maintaining the class action through the trial weighs in favor of approval..................................................12

        6.      *Grinnell* Factor No. 7. The defendants' ability to withstand a greater judgment does not weigh against approval. ....................................13

        7.      *Grinnell* Factor Nos. 8 and 9. The Settlement is well within the range of reasonableness in light of the best possible recovery and all of the attendant risks of litigation. ...............................................................13

        8.      Additional considerations.................................................................................15

    C.      The plan of allocation is fair, reasonable, and adequate and should be approved.................................................................................................................17

IV.     CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*,
  512 F. Supp. 3d 196 (D. Mass. 2020) ...................................................................................12

*In re Automotive Refinishing Paint Antitrust Litig.*,
  MDL No. 1426, 2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004) ..................................10

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ...........................................................................................5

*In re Celexa and Lexapro Mktg. and Sales Pracs. Litig.*,
  No. 09-cv-2067, 2014 WL 4446464 (D. Mass. Sept. 8, 2014) ..........................................14

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ...........................................................................................*passim*

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) ...........................................................................................15

*In re Elec. Carbon Prods. Antitrust Litig.*,
  447 F. Supp. 2d 389 (D.N.J. 2006) ...................................................................................12

*In re Flonase Antitrust Litig*,
  951 F. Supp. 2d 739 (E.D. Pa. 2013) ...............................................................................16

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tanks Prods. Liab. Litig.*,
  55 F.3d 768 (3rd Cir. 1995) ...........................................................................................3, 14

*Giusti-Bravo v. U.S. Veterans Admin.*,
  853 F. Supp. 34 (D.P.R. 1993) ...........................................................................................16

*In re Glumetza Antitrust Litig.*,
  No. 19-cv-5822, 2022 U.S. Dist. LEXIS 20157 (N.D. Cal. Feb. 3, 2022) ............................16

*Granada Invs., Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) .............................................................................................3

*Greenspun v. Bogan*,
  492 F.2d 375 (1st Cir. 1974) ...............................................................................................5

*Gulbankian v. MW Mfrs., Inc.*,
  No. 10-cv-10392, 2014 WL 7384075 (D. Mass. Dec. 29, 2014) ...............................8, 11, 14, 15

*Hill v. State St. Corp.*,
        No. 09-cv-12146, 2015 WL 127728 (D. Mass. Jan. 8, 2015)........................................17

*Hochstadt v. Boston Sci. Corp.*,
        708 F. Supp. 2d 95 (D. Mass. 2010) .........................................................................17

*In re Lidoderm Antitrust Litig.*,
        No. 14-md-2521, 2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017)..............16

*In re Loestrin 24 Fe Antitrust Litig.*,
        No. 13-md-2472, 2020 U.S. Dist. LEXIS 125746 (D.R.I. July 17, 2020)..................16

*In re Lupron Mktg. & Sales Pracs. Litig.*,
        228 F.R.D. 75 (D. Mass. 2005)..................................................................................14

*In re Lupron Mktg. & Sales Pracs. Litig.*,
        MDL No. 1430, 2005 WL 2006833 (D. Mass. Aug. 17 2005).............................11, 12

*In re M.D.C. Holdings Sec. Litig.*,
        No. 89-cv-0090, 1990 WL 454747 (S.D. Cal. Aug. 30, 1990) ....................................9

*Meijer, Inc. v. Ranbaxy Inc.*,
        245 F. Supp. 3d 312 (D. Mass. 2017) .......................................................................11

*In re Modafinil Antitrust Litig.*,
        837 F.3d 238 (3d Cir. 2016) ......................................................................................13

*Mullane v. Cent. Hanover Bank & Trust Co.*,
        339 U.S. 306 (1950).....................................................................................................8

*New Eng. Carpenters Benefits Fund v. First DataBank, Inc.*,
        602 F. Supp. 2d 277 (D. Mass. 2009) ...............................................................4, 5, 10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
        842 F.3d 34 (1st Cir. 2016).......................................................................................12

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
        588 F.3d 24 (1st Cir. 2009).................................................................................4, 15

*In re Prograf Antitrust Litig.*,
        No. 11-cv-10344, 2013 U.S. Dist. LEXIS 62043 (D. Mass. Apr. 23, 2013)..............16

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
        148 F.3d 283 (3d Cir. 1998) .......................................................................................9

*In re Relafen Antitrust Litig.*,
        231 F.R.D. 52 (D. Mass. 2005).............................................................................*passim*

*In re Remeron Direct Purchaser Antitrust Litig.*,
No. 03-cv-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005)......................................9, 13

*Rolland v. Cellucci*,
191 F.R.D. 3 (D. Mass. 2000) ..............................................................................14, 16

*Shapiro v. JPMorgan Chase & Co.*,
No. 11-cv-8331, 2014 U.S. Dist. LEXIS 37872 (S.D.N.Y. Mar. 21, 2014) ...........................13

*In re Shopping Carts Antitrust Litig.*,
MDL No. 451, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983)....................................................10

*Siegel v. Realty Equities Corp. of New York*,
No. 70-cv-4338, 1973 WL 414 (S.D.N.Y. July 30, 1973) .................................................3

*In re Solodyn Antitrust Litig.*,
No. 14-md-2503, 2018 U.S. Dist. LEXIS 244677 (D. Mass. July 18, 2018)...........................16

*Staley v. Gilead Sciences, Inc.*,
No. 19-cv-2573 (N.D. Cal. Sep. 9, 2019), ECF No. 163......................................................16

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ...........................................5

*Storage Tech. Corp. v. Custom Hardware Engineering & Consulting*,
No. 02-cv-12102, 2006 WL 1766434 (D. Mass. June 28, 2006)...........................................10, 11

*In re Suboxone Antitrust Litig.*,
No. 13-md-2445 (E.D. Pa. Aug. 7, 2013), ECF No. 44........................................................16

*Sutton v. Med. Serv. Ass'n of Pa.*,
No. 92-cv-4787, 1994 WL 246166 (E.D. Pa. June 8, 1994)................................................12

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990)...............................................................................................3

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005).............................................................................................10

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) .....................................9, 10

*In re Wellbutrin XL Antitrust Litig.*,
133 F. Supp. 3d 734 (E.D. Pa. 2015), *aff'd*, 868 F.3d 132 (3d Cir. 2017)...................................12

*In re Wellbutrin XL Antitrust Litig.*,
No. 08-cv-2431, 2011 U.S. Dist. LEXIS 90075 (E.D. Pa. Aug. 11, 2011) ...............................16

*Williams v. First Nat'l Bank,*
  216 U.S. 582 (1910)..................................................................................................3

*In re Zetia Antitrust Litigation.,*
  7 F.4th 227 (4th Cir. 2021).....................................................................................13

**Other Authorities**

Fed R. Civ P. 23........................................................................................3, 8, 16

Newberg on Class Actions, § 8:45 (4th ed. 2011) ...........................................17

# I.    INTRODUCTION

Lead Counsel representing plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Plaintiffs" and "Class Representatives"), and the certified direct purchaser classes (the "Direct Purchaser Classes") respectfully submit this memorandum in support of their Unopposed Motion for Final Approval of Settlement, Approval of Proposed Plan of Allocation, and Order of Dismissal with Prejudice.[1] The settlement (the "Settlement"), achieved after seven years of hard-fought litigation and on the eve of trial, provides for $340 million in cash to be paid to the Direct Purchaser Classes in exchange for the dismissal of the direct purchaser action with prejudice, and the provision of releases from the Direct Purchaser Classes, as set forth in the parties' Settlement Agreement.[2]

The Settlement, the product of contested, arm's-length negotiations spanning many months and involving experienced and highly skilled counsel, provides an excellent result for the Direct Purchaser Classes. The proposed Settlement is in all respects fair, reasonable, and adequate, and should be granted final approval. Members of the Direct Purchaser Classes received individual direct mail notice, informing them of the Settlement, their rights to object, and Lead Counsel's requests for attorneys' fees (of up to one-third of the Settlement Fund net of expenses) and service awards for the Class Representatives of $40,000 each.[3] The favorable reaction of the Direct Purchaser Classes confirms the fairness and reasonableness of the

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Order Granting Direct Purchaser Class Plaintiffs' Unopposed Mot. for Prelim. Approval of Proposed Settlement (ECF No. 593).

[2] The Settlement Agreement is already on file with the Court. *See* Exhibit 1 to the Decl. of Thomas M. Sobol ("Sobol Decl. Ex."), ECF No. 590-1 ("Settlement Agreement").

[3] *See* Decl. of Co-Lead Counsel, Thomas M. Sobol, for the Direct Purchaser Classes in Support of Direct Purchaser Plfs.' Unopposed Mot. for Final Approval of Proposed Settlement, Approval of Proposed Plan of Allocation, and Order of Dismissal with Prejudice ("Co-Lead Counsel Decl.") (filed herewith), Ex. 3, Decl. of Amy Fringer Regarding Notice of Settlement to the Direct Purchaser Classes ("Fringer Decl."), attaching as "Exhibit A" the Settlement Notice sent to members of the Direct Purchaser Classes ("Settlement Notice"); *see also* Settlement Notice at ¶¶ 6, 13, 14.

Settlement and of the accompanying requests. No objections have been received.

Lead Counsel, on behalf of the Direct Purchaser Classes, respectfully request that this Court issue an Order granting final approval of the proposed settlement, approving the proposed plan of allocation, and dismissing the direct purchaser action with prejudice. Lead Counsel have also requested an order awarding attorneys' fees and expenses and approving service awards, and respectfully request that the Court grant that order.[4]

## II.    SUMMARY OF THE CASE

The facts and procedural history of this case are well known to this Court, were recently recounted in the preliminary approval papers, and are discussed at length in the motion for an award of attorneys' fees, reimbursement of expenses, and service awards and the Declaration of Greg Arnold in support thereof. A brief overview is provided.

This case, grounded in both federal antitrust and racketeering statutes, was unique; it was brought following class counsel's independent investigation of complex facts relating to Ranbaxy's actions and misrepresentations related to its efforts to obtain approvals on certain drug applications from the Food & Drug Administration (FDA).[5] It rested on a factual record largely unknown in the public record, and required substantial time and effort to uncover the 30+ misrepresentations made by Ranbaxy during the critical time period. Defense counsel vigorously contested liability from the filing of the complaint through pretrial proceedings, relying on Supreme Court precedent which they contended barred the claims in their entirety.[6] And there was no roadmap; no direct appellate authority supported the theories asserted, and

---

[4] For the Court's convenience, the proposed Orders submitted with those motions are attached as Exhibits 1 and 2 to the Decl. of Co-Lead Counsel.

[5] *See* Decl. of Gregory T. Arnold in Supp. of Direct Purchaser Plfs.' Mot. for an Award of Attys' Fees, Reimbursement of Expenses, and Serv. Awards ("Arnold Decl.") §§ II.A & II.B.

[6] *See generally*, Arnold Decl., §§ II.B., II.C.2., II.G.4., II.M., II.N.3.

the risk of complete rejection persisted throughout the case.[7] Through it all, class counsel persisted, securing $340 million for the direct purchaser classes.

## III.   ARGUMENT

### A.  Legal Standard

Courts encourage settlement of lawsuits.[8] Courts particularly encourage settlements in complex litigation because settlements promote the interest of judicial economy.[9] In evaluating settlements like the one at issue here, courts have recognized that complex litigation is "notoriously difficult and unpredictable."[10] "Absent evidence of fraud or collusion, such settlements are not to be trifled with."[11]

Rule 23(e)(2) of the Federal Rules of Civil Procedure provides that a court may approve a class action settlement if it is "fair, reasonable, and adequate." Courts are awarded wide latitude in determining whether a class action settlement is reasonable. Rule 23(e)(2) provides,

> a district court can approve a class action settlement only if it is fair, adequate and reasonable, or (in shorthand) reasonable. If the parties negotiated at arm's-length and conducted sufficient discovery, the district court must presume the settlement is reasonable. The district court enjoys considerable range in approving and disapproving a class settlement, given the

---

[7] *See* Arnold Decl., §§ II.A.

[8] *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("[C]ompromises of disputed claims are favored by the courts . . . ."); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("[I]t is the policy of the law to encourage settlements.").

[9] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tanks Prods. Liab. Litig.*, 55 F.3d 768, 784 (3rd Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *Siegel v. Realty Equities Corp. of New York*, No. 70-cv-4338, 1973 WL 414, at *2 (S.D.N.Y. July 30, 1973) ("Public policy favors settlement. This policy not only fosters judicial economy but also encourages litigants to determine their respective rights in arms-length bargaining likely to produce a fair settlement.").

[10] *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).

[11] *Id.* at 1205.

generality of the standard and the need to balance a settlement's
benefits and costs.[12]

The "fairness determination is not based on a single inflexible litmus test but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."[13] Courts in the First Circuit have relied on more than one list of factors, though the lists are "fundamentally similar."[14] The most exhaustive of these lists comes from the Second Circuit in *City of Detroit v. Grinnell Corp.*, which analyzes the following factors (the "*Grinnell* factors"):

1) the complexity, expense, and likely duration of the litigation;

2) the reaction of the class to the settlement;

3) the stage of the proceedings and the amount of discovery completed;

4) the risks of establishing liability;

5) the risks of establishing damages;

6) the risks of maintaining the class action through the trial;

7) the ability of the defendants to withstand a greater judgment;

8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[15]

---

[12] *See In re Pharm. Indus. Avg. Wholesale Price Litig.* ("*AWP*"), 588 F.3d 24, 32–33 (1st Cir. 2009) (*citing City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *Nat'l Ass'n of Chain Drug Stores v. New Engl. Carpenters Benefits Fund*, 582 F.3d 30, 44–45 (1st Cir. 2009)).

[13] *New Eng. Carpenters Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277, 280 (D. Mass. 2009) (*citing Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999)).

[14] *Id.* at 281.

[15] *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005) ("*Relafen*").

Courts reviewing settlements recognize that not all of the *Grinnell* factors must be satisfied for a settlement to receive approval; instead, courts look at the factors in light of the circumstances of the case.[16] A court should neither substitute its judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the merits of the action.[17]

### B.   The Settlement should be approved as fair, reasonable, and adequate.

While courts in this Circuit have recognized that a shorter (though still fundamentally similar) list may be more appropriate given the facts and posture of a certain case,[18] for the sake of completeness, the direct purchasers will address all factors articulated in *Grinnell*, as well as the negotiations and quality of counsel. Based on these factors, the Settlement satisfies the criteria for final approval.

### 1.   *Grinnell* Factor No. 1. The litigation lasted for years, involved numerous complexities, and was expensive to prosecute.

The duration, complexity, and expense of this seven-year litigation weigh in favor of approving the proposed Settlement. Antitrust class actions are "arguably the most complex action(s) to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome."[19] This case is no exception. And in many respects, the direct purchasers' action, which pursued both antitrust and RICO claims, has been more complex than many other antitrust class actions.

---

[16] *First DataBank*, 602 F. Supp. 2d at 280–81.

[17] *See Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) ("[A]ny settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.").

[18] *First DataBank*, 602 F. Supp. 2d at 280–81.

[19] *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, *11 (E.D. Pa. May 19, 2005) (quoting *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)). *See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("Moreover, the complexity of this case cannot be overstated. Antitrust class actions are inherently complex . . . .").

The direct purchasers' allegations against Ranbaxy were not based on a previous government investigation or public reporting.[20] Rather, Lead Counsel engaged in its own independent factual investigation, uncovering a multi-year scheme by Ranbaxy and its co-conspirators to defraud the FDA into wrongfully granting Ranbaxy regulatory exclusivities for three generic drugs (Nexium, Valcyte, and Diovan). Following this investigation, Lead Counsel developed original legal theories for pursuing relief on behalf of injured class members, and ultimately brought novel legal claims against Ranbaxy under the RICO statute and Section 2 of the Sherman Act.

To make out its antitrust claims (and survive Rule 12 and summary judgment challenges), Lead Counsel had to demonstrate, *inter alia*, that Ranbaxy misled the FDA into granting it first-to-file exclusivities for generic Nexium, Valcyte, and Diovan (despite arguably contradictory evidence from the agency on that point), that these regulatory exclusivities resulted in Ranbaxy obtaining "market power" in all three drug markets (even though Ranbaxy never sold two of the three drugs at issue), and that Ranbaxy's scheme caused each of three Direct Purchaser Classes to suffer harm (requiring proof that other generic companies would have entered the markets earlier if not prevented from doing so by Ranbaxy's ill-gotten exclusivities). To make out its RICO claims, Lead Counsel had to further demonstrate additional legal and factual predicates, including that certain Ranbaxy consultants and attorneys were members of Ranbaxy's illegal enterprise to defraud the FDA (and not mere agents of Ranbaxy). Other legal complexities also existed, such as the need to avoid federal preemption by ensuring that the direct purchasers' factual positions did not conflict with the FDA's (arguably inconsistent) statements over the years about its handling of Ranbaxy's Nexium, Valcyte, and Diovan ANDAs. And because three different drugs were implicated by

---

[20] *See* Arnold Decl. at § II.A.

Ranbaxy's scheme, class certification required economic analyses for three different direct purchaser classes.[21]

Despite facing considerable uncertainties, Lead Counsel – along with other counsel for the classes ("Class Counsel") – successfully litigated the direct purchaser action for seven years, investing significant attorney time and financial resources in the process. Class Counsel conducted independent research, took extensive fact discovery, worked with noted experts (in economics, biochemistry, patent law, and other fields), and engaged in motion practice at all stages of the litigation.[22] It was only after obtaining certification for three classes, and filing and defending against multiple motions for summary judgment, as well as numerous *Daubert* motions and motions *in limine*, that the parties settled on the eve of trial. Class Counsel ultimately incurred over $40 million in attorney time and spent over $3 million in out-of-pocket expenses to litigate the direct purchaser action and bring it to the brink of trial.[23] Notably, the full financial risk of prosecuting this litigation was borne by Class Counsel, as it did not avail itself of any litigation financing.[24]

In light of these and other facts, "[t]he complexity, expense and . . . duration of the litigation . . . all weigh heavily in favor of final approval" of the proposed Settlement.[25]

2. ***Grinnell* Factor No. 2. All members of the Direct Purchaser Classes received direct mail and/or email notice, and no member of any of the Direct Purchaser Classes has objected.**

In considering whether to grant final approval of a proposed class action Settlement, the Court must determine whether adequate notice was issued to all prospective class members, in

---

[21] Arnold Decl. at § II.K.

[22] Arnold Decl. at § II.A.-N.

[23] Arnold Decl. at § I.C.

[24] Arnold Decl. at § I.C.

[25] *Relafen*, 231 F.R.D. at 72.

accordance with due process concerns and Rule 23. To satisfy due process considerations, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[26]

This Court approved the form of notice that was mailed directly via first-class U.S. mail to members of the Direct Purchaser Classes.[27] The Notice described the claims alleged in the class action, the terms of the Settlement Agreement, the rights of members of the Direct Purchaser Classes under the Settlement (including the right to object to any terms of the Settlement), Class Counsel's request for fees (not to exceed one-third of the Settlement Fund net of expenses), the request for proposed service awards to the Class Representatives (of $40,000 each), and that the Settlement Funds would be distributed to members of the Direct Purchaser Classes on a *pro rata* basis, consistent with the proposed plan of allocation.[28] Direct Purchaser Class members were also advised that they may appear at the Sept. 8, 2022 fairness hearing.[29] Accordingly, the Notice fairly apprised Direct Purchaser Class members of the Settlement and their options and satisfied the requirements of due process and Rule 23(c)(2).

The positive response of members of the Direct Purchaser Classes to the proposed Settlement supports final approval. "Reaction to a settlement is positive when the number of objectors is minimal compared with the number of claimants, provided notice effectively reached absent class members."[30] No member of any of the Direct Purchaser Classes has filed an

---

[26] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[27] ECF No. 593.

[28] Settlement Notice at 9, 11.

[29] Settlement Notice at 13.

[30] *Gulbankian v. MW Mfrs., Inc.*, No. 10-cv-10392, 2014 WL 7384075, at *2 (D. Mass. Dec. 29, 2014).

objection to any aspect of the proposed Settlement.[31] "Such acceptance of the Settlement on the part of the Class is convincing evidence of the proposed Settlement's fairness and adequacy."[32]

Where, as here, the classes are comprised of sophisticated business entities, the absence of any objections is a particularly strong indicator of the adequacy of the Settlement.[33] The absence of objections is particularly significant because numerous class members have been members of classes in other pharmaceutical antitrust cases challenging similar conduct, and are therefore well-situated to evaluate the proposed Settlement in this case.[34] The favorable reaction of the members of the Direct Purchaser Classes supports final approval of the proposed Settlement.

   **3.** ***Grinnell*** **Factor No. 3. The proceedings were at a late stage, on the eve of trial, after a thorough years-long discovery process, and the parties fully understood the strengths and weaknesses of the case at the time of the proposed Settlement.**

By the time the proposed Settlement was reached, the parties were within days of trial and had ample information to allow them to negotiate and reach an informed settlement. The parties had briefed motions to dismiss, numerous discovery motions, summary judgment motions, *Daubert* motions, and dozens of pretrial motions in *limine*. They had reviewed more than 2.8 million pages of discovery, deposed and defended over 40 depositions of fact and

---

[31] Arnold Decl. at § II.O.3.

[32] *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-cv-0085, 2005 WL 3008808, at *6 (D.N.J. Nov. 9, 2005) (citing *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement")); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected).

[33] *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254–55 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ("[T]he court finds the low number of objections from [third party payors] particularly significant, because these are sophisticated businesses with, in some case, large potential claims, and they could be expected to object to a settlement they perceived as unfair or inadequate."); *In re M.D.C. Holdings Sec. Litig.*, No. 89-cv-0090, 1990 WL 454747, at *7 n.5 (S.D. Cal. Aug. 30, 1990) (lack of objections "is significant since the class includes sophisticated financial institutions . . . who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses").

[34] *See Remeron*, 2005 WL 3008808, at *6 (citing *Relafen*, 231 F.R.D. 52).

9

expert witnesses, prepared opening statements, and drafted witness examination outlines.[35] As a result, Class Counsel and Ranbaxy understood the strengths and weaknesses of their respective claims and the defenses.[36] Class Counsel had a strong basis from which to negotiate the Settlement.[37] This factor, too, weighs in favor of approval.

### 4. *Grinnell* Factor Nos. 4 and 5. The proposed Settlement obviates the risks inherent in establishing liability and damages.

A settlement is approvable where it "avoids substantial risks and costs for both sides, giving a certain positive outcome in the face of a costly and uncertain one."[38] This factor applies here and weighs strongly in favor of final approval. As federal courts have long recognized, because "antitrust cases, by their nature, are highly complex,"[39] the "legal and factual issues involved are always numerous and uncertain in outcome."[40] This case is no exception. When the direct purchasers agreed in principle to the proposed Settlement, Class Counsel believed in the merits of the case. Class Counsel also recognized that success at trial on liability and damages—and then upon (a likely) appeal—was hardly assured.[41]

This was litigation at its riskiest. As noted above, the direct purchasers' liability case was a matter of first impression. It rested on the novel legal premises that a private party could

---

[35] Arnold Decl. at § II.D., II.E.1-2., II.G.2-7, II.H., II.N.1.

[36] *First DataBank*, 602 F. Supp. 2d at 280-81 (quoting *Grinnell*, 495 F.2d at 463).

[37] *See Warfarin*, 212 F.R.D. at 255 (finding this factor supported final approval of settlement since Class Counsel "pursued this litigation for over three years," "engaged in substantial discovery and coordinated these efforts with other plaintiffs' counsel," and "voluminous documents were reviewed and numerous depositions taken and motions filed.").

[38] *Storage Tech. Corp. v. Custom Hardware Engineering & Consulting*, No. 02-cv-12102, 2006 WL 1766434, at *21 (D. Mass. June 28, 2006) (citing *Hasbrouck v. Texaco, Inc.*, 842 F.2d. 1034, 1044 (9th Cir. 1987)).

[39] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005).

[40] *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004) (citing *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); *see In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive and lengthy").

[41] Arnold Decl. at § II.O.

recover under RICO for a drug company misleading the FDA into granting regulatory exclusivities, and that a generic drug manufacturer could acquire and abuse antitrust monopoly power in the market for drugs it had never sold.[42] This Court acknowledged the precariousness of the direct purchasers' liability theory in its 1292(b) decision, noting that "if the First Circuit decides that the rationale underlying *Buckman* also precludes federal claims alleging fraud on the FDA, the present case would be terminated."[43] Because the First Circuit declined the appeal without comment,[44] the case remained vulnerable to attack throughout, including on appeal.

In addition to complexities involved in establishing liability and antitrust causation, the direct purchasers faced the hurdle of having to prove damages. While the direct purchasers are confident in the proof of damages, a risk of not obtaining the support and endorsement of the jury and/or appellate courts nevertheless existed. Establishing damages in an antitrust class action is a complex task, and federal courts have long noted that in "antitrust cases … market uncertainties 'usually deny us the sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.'"[45] Antitrust jurisprudence is thus "replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages."[46]

---

[42] As Judge Kelley put, "there is no directly relevant precedent for alleging monopoly power where the product never actually reached the market and earned no profits." *See* Report & Recommendation on Defs.' Mot. to Dismiss 33 (June 6, 2016), *Meijer I*, ECF No. 52.

[43] *Meijer, Inc. v. Ranbaxy Inc.*, 245 F. Supp. 3d 312, 315 (D. Mass. 2017).

[44] *Meijer, Inc. v. Ranbaxy Inc.*, No. 17-8008 (1st Circ. Dec. 28, 2018).

[45] *Storage Tech.*, 2006 WL 1766434, at *21 (citing *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1044 (9th Cir. 1987)).

[46] *In re Lupron Mktg. & Sales Pracs. Litig.*, MDL No. 1430, 2005 WL 2006833 (D. Mass. Aug. 17 2005). *See also Gulbankian*, 2014 WL 7384075, at *3 (approving settlement after "extensive and well-developed discovery" had taken place, "[m]ultiple motions to compel" were filed, "over a dozen depositions" taken, and "[o]ver 130,000 pages of …produced."); *Relafen*, 231 F.R.D. at 73 ("This is not a case where the bulk of the attorneys' time was spent on negotiations. Class Counsel has consistently and vigorously been preparing for trial, which, were this Court to reject the Settlement, would commence in the near future.").

Absent the proposed Settlement, the direct purchasers would have had to try their untested legal theories in a complex jury trial. Trial would have posed a substantial risk to any recovery,[47] particularly given the potential for a wide swath of critical evidence to be precluded from trial (pursuant to Ranbaxy's aggressive motions in *limine*), and the lack of live fact witnesses through which Class Counsel could tell the story of the case. Even if the direct purchasers had prevailed at trial, a trial verdict would not have assured an appellate victory (much less the collectability of any damages award).[48] "Typical" pharmaceutical antitrust cases have met with mixed results on appeal,[49] and this case was anything but typical.

The direct purchasers believed (and believe now) that the Settlement, when viewed in light of the risks of litigation and time involved in getting an ultimate decision, was and is fair, adequate, and reasonable. The Settlement provides immediate, definite and substantial relief without the delay, risk, and uncertainty of continued litigation.

5. ***Grinnell* Factor No. 6. The risk of maintaining the class action through the trial weighs in favor of approval.**

Until 2016, not one direct purchaser class in a pharmaceutical antitrust case had ever been decertified. That year, a divided panel of the Court of Appeals for the Third Circuit,

---

[47] *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006); *Lupron*, 2005 WL 2006833, at *4 ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages."); *accord Sutton v. Med. Serv. Ass'n of Pa.*, No. 92-cv-4787, 1994 WL 246166, at *7 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs ultimately would have prevailed on liability, they faced the risk that they could not establish damages . . . that is achieved by this Settlement Agreement").

[48] Unlike situations (such as securities cases) in which the survival of motions early typically means some recovery is likely, *see, e.g.*, *Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 512 F. Supp. 3d 196, 217 (D. Mass. 2020) (quoting *In re Fidelity/Micron Secs. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999)), *appeal dismissed sub nom. Ark. Tchr. Ret. Sys. v. State St. Corp.*, No. 20-cv-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020), *and aff'd in part, appeal dismissed in part sub nom Arkansas Tchr. Ret. Sys. v. State St. Corp.*, 25 F.4th 55 (1st Cir. 2022), here the legal theories were untested in this Circuit (or elsewhere) and were supported by relatively little district court authority. The potential for little or no recovery thus persisted throughout the case.

[49] *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016) (affirming verdict and entry of judgment for defendants following a six-week jury trial); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) (granting summary judgment for defendants on grounds, inter alia, that the purchaser plaintiffs could not prove that they had suffered antitrust injury), *aff'd*, 868 F.3d 132 (3d Cir. 2017)).

presiding over *In re Modafinil Antitrust Litigation*, vacated the district court's decision to certify a (significantly smaller) direct purchaser class.[50] Last year, the Fourth Circuit also decertified a class of direct purchasers in *In re Zetia Antitrust Litigation*.[51] The direct purchasers believe the risk of decertification here is minimal: *Modafinil* and *Zetia* are not controlling in this Circuit, and even if they were, the standards for decertification identified in those cases are not met here. However, the minimal but extant risk weighs in favor of approving the proposed settlement.

6. ***Grinnell* Factor No. 7. The defendants' ability to withstand a greater judgment does not weigh against approval.**

The direct purchasers do not maintain that Ranbaxy could not withstand a judgment larger than the proposed settlement, but that does not weigh heavily against approval.[52] As in *Relafen*, "[t]his 'defendant oriented' consideration, is largely neutral as this is, evidently, a 'defendant [ ] with classic deep pockets.'"[53]

7. ***Grinnell* Factor Nos. 8 and 9. The Settlement is well within the range of reasonableness in light of the best possible recovery and all of the attendant risks of litigation.**

Courts also consider the range of reasonableness of the settlement in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these factors, the issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. "[T]he court . . . consider[s] and weigh[s]

---

[50] *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016).

[51] 7 F.4th 227, 239 (4th Cir. 2021).

[52] *Relafen*, 231 F.R.D. at 73 (citing *In re Lupron Mktg. & Sales Pracs. Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005)); *Remeron*, 2005 WL 3008808, at *9 ("[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts.").

[53] *Relafen*, 231 F.R.D. at 73 (citing *Lupron*, 228 F.R.D. at 97); *see also Shapiro v. JPMorgan Chase & Co.*, No. 11-cv-8331, 2014 U.S. Dist. LEXIS 37872, at *41 (S.D.N.Y. Mar. 21, 2014) (internal quotation omitted).

the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable,"[54] while "guard[ing] against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."[55] "[A] settlement need not reimburse 100% of the estimated damages to class members in order to be fair."[56] Potential damages, minus any trebling or any punitive damages, "appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."[57]

The Settlement provides a recovery well within the range of reasonableness in light of the best possible recovery and the risks of litigation outlined above.[58] The $340 million settlement amount secures an excellent result for the Direct Purchaser Classes. Although Class Counsel have always been (and remain) confident in the strength of the direct purchasers' claims, there was no guarantee that a jury would have found in favor of the Direct Purchaser Classes. Given the risk of no recovery or a substantially reduced recovery—a risk that would persist even after a lengthy and costly trial (and despite already-certified classes)—the Classes' recovery through settlement is substantial, and well within the range of possible approval.

---

[54] *Grinnell*, 495 F.2d at 462.

[55] *Gene. Motors.*, 55 F.3d 768 at 806 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

[56] *In re Celexa and Lexapro Mktg. and Sales Pracs. Litig.*, No. 09-cv-2067, 2014 WL 4446464, at *7 (D. Mass. Sept. 8, 2014). As Judge Young explained in *In re Relafen*, "[a] fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist. In any case, there is a range of reasonableness with respect to a settlement. Moreover, a high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes." 231 F.R.D. at 73 (citations omitted).

[57] *Lupron*, 228 F.R.D. at 98.

[58] *Gulbankian*, 2014 WL 7384075, at *5 (citing *Celexa*, 2014 WL 4446464, at *5) (in class action seeking damages to consumers from defective windows, settlement compensation was fair even though it did not cover "actual real world cost of replacing a defective window"); *Rolland v. Cellucci*, 191 F.R.D. 3, 14–15 (D. Mass. 2000). ("In evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim." (citation omitted)).

**8.   Additional considerations.**

  **a.   The proposed Settlement is the result of arm's-length negotiations.**

Where a settlement is "the product of arms-length negotiation following extensive discovery, its fairness is presumed."[59] The proposed Settlement here was negotiated at arm's-length by counsel experienced in similar class action antitrust cases.[60] Each side vigorously advocated and considered the strengths and weakness of its positions, weighing the costs and benefits of further litigation, prior to settlement. Through these comprehensive negotiations, Lead Counsel advocated the best possible case while pressing for the maximum recovery in light of the risks the Direct Purchaser Classes faced at the time from continued litigation. The time and effort spent, and the circumstances of the negotiations, are persuasive indicators that there was no collusion in either the negotiation process or the result achieved. An agreement in principle was reached on April 8, 2022, within days of trial. Settling so close to trial, after summary judgment briefing, and the Court's tentative rulings on various motions in *limine*, the parties were fully aware of the strengths and weaknesses of the case.[61] The Settlement is presumptively fair.[62]

  **b.   The quality of class counsel weighs in favor of approval.**

In approving class action settlements, courts give great weight to the opinion and judgment of experienced counsel who have conducted arm's-length negotiations. "When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable,

---

[59] *Gulbankian*, 2014 WL 7384075, at *2.

[60] Arnold Decl. at § II.O.

[61] *See, e.g., AWP*, 588 F.3d at 29, 32-33 (approving settlement entered into on eve of trial).

[62] *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996).

and adequate should be given significant weight."[63] With respect to the quality of counsel, courts have looked at various factors, including "the length of their involvement with the litigation, their competence, and their experience in this particular type of litigation."[64]

Lead Counsel respectfully submit that the quality of their work in this case is apparent from their vigorous prosecution of this action. In addition, Lead Counsel have extensive background and experience in litigating pharmaceutical antitrust cases over the past two decades.[65] Courts have recognized Lead Counsel's expertise in this field and have repeatedly adjudged Lead Counsel adequate under Rule 23(a)(4) and 23(g).[66]

Lead Counsel, who are most familiar with the facts, legal arguments, and risks attendant to continued litigation against the defendants in this case, believe the proposed settlement to be fair, reasonable, and in the best interest of the Direct Purchaser Classes.[67]

---

[63] *Rolland*, 191 F.R.D. at 10.

[64] *Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 40 (D.P.R. 1993).

[65] *See* Sobol Decl. Exs. 11 & 12, ECF Nos. 590–11, 590–12 (Firm Resumes of Co-Lead Counsel).

[66] *See, e.g., In re Glumetza Antitrust Litig.*, No. 19-cv-5822, 2022 U.S. Dist. LEXIS 20157, at *38 (N.D. Cal. Feb. 3, 2022) (noting "counsel [including co-leads Hagens Berman and Hilliard Shadowen] provided strong representation for the class"); *In re Solodyn Antitrust Litig.*, No. 14–md-2503, 2018 U.S. Dist. LEXIS 244677, at *9 (D. Mass. July 18, 2018) ("The Court finds that Co-Lead Counsel [Hagens Berman] . . . along with other Class Counsel, have fairly and adequately represented the interests of the Class and satisfied the requirements of Fed. R. Civ. P. 23(g) . . . ."); *In re Lidoderm Antitrust Litig.*, No. 14–md-2521, 2017 U.S. Dist. LEXIS 24097, at *60 n.14 (N.D. Cal. Feb. 21, 2017) (appointing Hagens Berman co-lead counsel based on experience and adequacy and because "[that] firm[] ha[s] ably and vigorously litigated this case"); Order at 3, *In re Suboxone Antitrust Litig.*, No. 13–md-2445 (E.D. Pa. Aug. 7, 2013), ECF No. 44 (appointing Hagens Berman and Hilliard Shadowen co-lead counsel); *In re Prograf Antitrust Litig.*, No. 11-cv-10344, 2013 U.S. Dist. LEXIS 62043, at *8 (D. Mass. Apr. 23, 2013) (finding class counsel Hagens Berman "well-qualified"); *In re Flonase Antitrust Litig*, 951 F. Supp. 2d 739, 747 (E.D. Pa. 2013) (counsel including Hagens Berman were "knowledgeable, tenacious, and highly skillful"); *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431, 2011 U.S. Dist. LEXIS 90075, at *16 (E.D. Pa. Aug. 11, 2011) (class counsel Hagens Berman were "well-qualified to represent the proposed class in this case. They have extensive experience in similar class actions involving delayed generic competition. The plaintiff's counsel also have vigorously and capably prosecuted this action"); *In re Loestrin 24 Fe Antitrust Litig.*, No. 13–md-2472, 2020 U.S. Dist. LEXIS 125746, at *48 (D.R.I. July 17, 2020) (finding counsel, including co-lead Hilliard Shadowen, "have demonstrated that they are skillful and well-experienced and that they have effectively and efficiently prosecuted this complex and protracted litigation to the benefit of the" class); *see also In re Aggrenox Antitrust Litig.*, No. 14–md-2516 (D. Conn. Mar. 6, 2018), ECF No. 766 (appointing Hilliard Shadowen as co-lead counsel); *Staley v. Gilead Sciences, Inc.*, No. 19-cv-2573 (N.D. Cal. Sep. 9, 2019), ECF No. 163 (appointing Hilliard & Shadowen and Hagens Berman as interim co-lead counsel)

[67] Arnold Decl. at § II.O.

**C. The plan of allocation is fair, reasonable, and adequate and should be approved.**

Court approval of the plan for the allocation of a class settlement fund is governed by the same legal standards as the settlement: it must be "fair, reasonable and adequate."[68] Generally, an allocation plan is reasonable if it reimburses class members based on the type and extent of their injuries.[69] Courts routinely approve plans of allocation in antitrust settlements that allocate funds on a *pro rata* basis.[70]

The proposed plan of allocation here meets this standard. As set forth in the direct purchasers' proposed Allocation Plan[71] (and the supporting declaration of Dr. Meredith Rosenthal[72]), the Allocation Plan (i) apportions the Net Settlement Fund among the Direct Purchaser Classes to create three drug-specific Net Settlement Funds (the "Drug-Specific Net Settlement Funds");[73] (ii) calculates each Class Member's *pro rata* weighted share of each Drug-

---

[68] *Hill v. State St. Corp.*, No. 09-cv-12146, 2015 WL 127728, at *11 (D. Mass. Jan. 8, 2015) ("A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable and adequate."). *See also Hochstadt v. Boston Sci. Corp.*, 708 F. Supp. 2d 95, 109 (D. Mass. 2010) ("As with the settlement itself, 'the plan of allocation must be fair, reasonable, and adequate.'" (quoting *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249, 262 (D.N.H. 2007))).

[69] *Hill*, 2015 WL 127728, at *11 (approving a pro rata settlement and noting that "[a] reasonable plan of allocation . . . may allocate funds based on the extent of class members' injuries and 'consider the relative strength and values of different categories of claims'" (internal citation and quotations omitted)).

[70] 3 Newberg on Class Actions, § 8:45 (4th ed. 2011) ("Typically, a class recovery in antitrust or securities suits will divide the common fund on a pro rata basis among all who timely file eligible claims, thus leaving no unclaimed funds.").

[71] The Allocation Plan is already on file with the Court. Sobol Decl. Ex. 5, ECF No. 590-5.

[72] *See* Sobol Decl. Ex. 9, ECF No. 590-9 ("Rosenthal Declaration").

[73] To ensure that each Direct Purchaser Class receives an equitable share of the Net Settlement Fund, Lead Counsel previously appointed separate counsel ("Allocation Counsel") to advocate on behalf of each Direct Purchaser Class in the event of a successful resolution of the case. Allocation Counsel engaged in vigorous, arms-length negotiations over the percentage of funds that each Direct Purchaser Class would receive from any future settlement with Ranbaxy based on the particular facts and circumstances surrounding each drug, including issues related to establishing Ranbaxy's liability to each Direct Purchaser Class, causation issues presented by the circumstances of each drug's alternate entry scenarios, and the comparison of potential damages owed to each Direct Purchaser Class. Allocation Counsel determined that an equitable allocation of the Net Settlement Fund would allocate fifty percent (50%) of the Net Settlement Fund to the Diovan Class, forty-five percent (45%) of the Net Settlement Fund to the Nexium Class, and five percent (5%) of the Net Settlement Fund to the Valcyte Class. *See* Sobol Decl. Ex. 6, ECF No. 590-6 (Decl. of Joseph Meltzer on behalf of the Diovan Class); Sobol Decl. Ex. 7,

Specific Net Settlement Fund based on its combined net unit purchases of (a) brand and generic Diovan made directly from any brand or generic manufacturer, (b) brand and generic Nexium made directly from any brand or generic manufacturer, and/or (c) brand and generic Valcyte made directly from any brand or generic manufacturer, but excluding from the calculation all brand units attributable to persons or entities that purchased only branded Valcyte; and (iii) allocates the Net Settlement Fund among Class Members in proportion to the sum of the Class Member's *pro rata* weighted share of each Drug-Specific Net Settlement Fund.[74]

The Allocation Plan is similar to other court-approved *pro rata* allocation plans in cases brought by direct purchasers to recover overcharges arising from delayed generic competition and can be implemented with a high degree of efficiency.[75] In addition, in Dr. Rosenthal's opinion:

> [T]his allocation method is practical and efficient. . . Since this method relies on actual transactional sales data showing Claimants' actual purchases of these drugs, it represents a reasonable method for reimbursing Claimants based on the type (brand purchases or generic purchases) and extent (unit pill volume purchased) of their injuries.[76]

The Allocation Plan proposes to send a separate, individualized Claim Form to each Class Member, pre-populated with that Class Member's total qualifying brand and generic

---

ECF No. 590-7 (Decl. of Linda Nussbaum on behalf of the Nexium Class); Sobol Decl. Ex. 8, ECF No. 590-8 (Decl. of Kenneth A. Wexler on behalf of the Valcyte Class).

[74] Allocation Plan, at 2.

[75] *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2819 (E.D.N.Y.), ECF Nos. 490-7, 562 (approved Oct. 7, 2020); *In re Loestrin*, No. 13-md-2472 (D.R.I.), ECF Nos. 1396-8, 1462 (approved Sept. 1, 2020); *In re Lidoderm Antitrust Litig.*, No. 14-md-2521 (N.D. Cal.), ECF Nos. 1004-5, 1054 (approved Sept. 20, 2018); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, (D. Mass.), ECF Nos. 1163-4, 1179 (approved July 18, 2018); *Am. Sales Co., LLC v. Pfizer, Inc.* (*Celebrex*), No. 14-361 (E.D. Va.), ECF Nos. 609-4, 630 (approved Apr. 18, 2018); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn. Dec. 19, 2017), ECF Nos. 733-1, 740; *In re Asacol Antitrust Litig.*, No. 15-cv-12730 (D. Mass.), ECF Nos. 419-9, 648 (approved Dec. 7, 2017); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.* (*Provigil*), No. 06-cv-1797 (E.D. Pa.), ECF Nos. 864-17, 870 (approved Oct. 15, 2015).

[76] Rosenthal Decl., at 5.

direct purchases, as calculated by Dr. Rosenthal based on transactional sales data produced in this case. The Claim Form will (a) request that each Class Member verify the accuracy of the information contained in the Claim Form, and (b) provide instructions for challenging any of the figures or computations contained in the Claim Form. If a Class Member agrees that the information contained in the Claim Form is accurate, it will be asked to sign the Claim Form verifying its accuracy and timely mail it to the Settlement Administrator. If a Class Member believes that the information contained in its Claim Form is not accurate, that Class Member may submit its own purchase records pursuant to the procedures described in the Allocation Plan.[77]

Each Claimant will be required to execute and return the Claim Form to receive any distribution from the Net Settlement Fund. The Settlement Administrator shall follow-up, by phone, email, and/or mail, with any Class Member that does not timely return a Claim Form to attempt to confirm that the decision not to submit a Claim Form was intentional and to address any questions the Class Member may have.[78]

The proposed Allocation Plan fairly and appropriately reimburses Class Members on a *pro rata* weighted basis, based on the extent of their injuries. The Plan is also easy to implement, allowing Dr. Rosenthal to use existing data to determine the volume of relevant purchases for each Class Member, subject to possible adjustment based on purchase data submitted by Class Members should they choose to submit their own data.[79]

The Proposed Plan of Allocation reimburses Class members on a *pro rata* basis, based on the extent of their injuries, and is fair, reasonable and adequate, and should be approved.

---

[77] Allocation Plan at 5-6.

[78] *Id.* at 6-7.

[79] *Id.* at 4, 9-10.

## IV.   CONCLUSION

For the reasons detailed above, and in other supporting documents including Lead Counsel's motion for an award of attorneys' fees and approval of services awards to the class representatives and the accompanying documents thereto, the direct purchasers respectfully request that the Court issue orders (1) granting final approval of the proposed settlement, approving the plan of allocation of the settlement funds to members of the classes, and ordering dismissal of the direct purchaser action with prejudice; and (2) approving service awards to the class representatives and awarding attorneys' fees.

Dated:  June 27, 2022                          Respectfully Submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol (BBO# 471770)
Gregory T. Arnold (BBO #632738)
Kristen A. Johnson (BBO #667261)
Kristie A. LaSalle (BBO #692891)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
grega@hbsslaw.com
kristenj@hbsslaw.com
kristiel@hbsslaw.com

Steve D. Shadowen (admitted *pro hac vice*)
HILLIARD SHADOWEN LLP
1135 W. 6th St., Ste. 125
Austin, Texas 78703
Tel: (855) 344-3928
steve@hilliardshadowenlaw.com

*Lead Class Counsel for the Direct Purchaser Classes*

John D. Radice (admitted *pro hac vice*)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com

Paul E. Slater (admitted *pro hac vice*)
Joseph M. Vanek (admitted *pro hac vice*)
David P. Germaine (admitted *pro hac vice*)
John Bjork (admitted *pro hac vice*)
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
pes@sperling-law.com
jvanek@sperling-law.com
dgermaine@sperling-law.com
jbjork@sperling-law.com
mslater@sperling-law.com

Joseph H. Meltzer (admitted *pro hac vice*)
Terence S. Ziegler (admitted *pro hac vice*)
Ethan J. Barlieb (admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com
ebarlieb@ktmc.com

Kenneth A. Wexler (admitted *pro hac vice*)
Justin Boley (admitted *pro hac vice*)
Tyler Story (admitted *pro hac vice*)
**WEXLER BOLEY & ELGERSMA LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

Sharon K. Robertson (admitted *pro hac vice*)
Donna M. Evans (BBO #554613)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Counsel for Plaintiffs Meijer, Inc., Meijer Distribution, Inc., and the Direct Purchaser Classes*

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Tel: (917) 438-9189
lnussbaum@nussbaumpc.com

*Counsel for the Direct Purchaser Classes*

## **CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.


Dated: June 27, 2022                                 /s/ Thomas M. Sobol
                                                            Thomas M. Sobol